(Slip Opinion)          OCTOBER TERM, 2010          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## J. D. B. *v.* NORTH CAROLINA

### CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

No. 09–11121.   Argued March 23, 2011—Decided June 16, 2011

Police stopped and questioned petitioner J. D. B., a 13-year-old, seventh-grade student, upon seeing him near the site of two home break-ins. Five days later, after a digital camera matching one of the stolen items was found at J. D. B.'s school and seen in his possession, Investigator DiCostanzo went to the school. A uniformed police officer on detail to the school took J. D. B. from his classroom to a closed-door conference room, where police and school administrators questioned him for at least 30 minutes. Before beginning, they did not give him *Miranda* warnings or the opportunity to call his grandmother, his legal guardian, nor tell him he was free to leave the room. He first denied his involvement, but later confessed after officials urged him to tell the truth and told him about the prospect of juvenile detention. DiCostanzo only then told him that he could refuse to answer questions and was free to leave. Asked whether he understood, J. D. B. nodded and provided further detail, including the location of the stolen items. He also wrote a statement, at DiCostanzo's request. When the school day ended, he was permitted to leave to catch the bus home. Two juvenile petitions were filed against J. D. B., charging him with breaking and entering and with larceny. His public defender moved to suppress his statements and the evidence derived therefrom, arguing that J. D. B. had been interrogated in a custodial setting without being afforded *Miranda* warnings and that his statements were involuntary. The trial court denied the motion. J. D. B. entered a transcript of admission to the charges, but renewed his objection to the denial of his motion to suppress. The court adjudicated him delinquent, and the North Carolina Court of Appeals and State Supreme Court affirmed. The latter court declined to find J. D. B.'s age relevant to the determination whether he was in police custody.

Syllabus

*Held:* A child's age properly informs *Miranda*'s custody analysis.  Pp. 5–18.

(a) Custodial police interrogation entails "inherently compelling pressures," *Miranda* v. *Arizona*, 384 U. S. 436, 467, that "can induce a frighteningly high percentage of people to confess to crimes they never committed," *Corley* v. *United States*, 556 U. S. ___, ___.  Recent studies suggest that risk is all the more acute when the subject of custodial interrogation is a juvenile.  Whether a suspect is "in custody" for *Miranda* purposes is an objective determination involving two discrete inquires: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave."  *Thompson* v. *Keohane*, 516 U. S. 99, 112 (footnote omitted).  The police and courts must "examine all of the circumstances surrounding the interrogation," *Stansbury* v. *California*, 511 U. S. 318, 322, including those that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave," *id.*, at 325.  However, the test involves no consideration of the particular suspect's "actual mindset."  *Yarborough* v. *Alvarado*, 541 U. S. 652, 667.  By limiting analysis to objective circumstances, the test avoids burdening police with the task of anticipating each suspect's idiosyncrasies and divining how those particular traits affect that suspect's subjective state of mind.  *Berkemer* v. *McCarty*, 468 U. S. 420, 430–431.  Pp. 5–8.

(b) In some circumstances, a child's age "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave."  *Stansbury*, 511 U. S., at 325.  Courts can account for that reality without doing any damage to the objective nature of the custody analysis.  A child's age is far "more than a chronological fact."  *Eddings* v. *Oklahoma*, 455 U. S. 104, 115.  It is a fact that "generates commonsense conclusions about behavior and perception," *Alvarado*, 541 U. S., at 674, that apply broadly to children as a class.  Children "generally are less mature and responsible than adults," *Eddings*, 455 U. S., at 115; they "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them," *Bellotti* v. *Baird*, 443 U. S. 622, 635; and they "are more vulnerable or susceptible to . . . outside pressures" than adults, *Roper* v. *Simmons*, 543 U. S. 551, 569.  In the specific context of police interrogation, events that "would leave a man cold and unimpressed can overawe and overwhelm a" teen.  *Haley* v. *Ohio*, 332 U. S. 596, 599.  The law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them.  Legal disqualifications on children as

a class—*e.g.*, limitations on their ability to marry without parental consent—exhibit the settled understanding that the differentiating characteristics of youth are universal.

Given a history "replete with laws and judicial recognition" that children cannot be viewed simply as miniature adults, *Eddings*, 455 U. S., at 115–116, there is no justification for taking a different course here. So long as the child's age was known to the officer at the time of the interview, or would have been objectively apparent to a reasonable officer, including age as part of the custody analysis requires officers neither to consider circumstances "unknowable" to them, *Berkemer*, 468 U. S., at 430, nor to "'"anticipat[e] the frailties or idiosyncrasies" of the particular suspect being questioned."'" *Alvarado*, 541 U. S., at 662. Precisely because childhood yields objective conclusions, considering age in the custody analysis does not involve a determination of how youth affects a particular child's subjective state of mind. In fact, were the court precluded from taking J. D. B.'s youth into account, it would be forced to evaluate the circumstances here through the eyes of a reasonable adult, when some objective circumstances surrounding an interrogation at school are specific to children. These conclusions are not undermined by the Court's observation in *Alvarado* that accounting for a juvenile's age in the *Miranda* custody analysis "could be viewed as creating a subjective inquiry," 541 U. S., at 668. The Court said nothing about whether such a view would be correct under the law or whether it simply merited deference under the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214. So long as the child's age was known to the officer, or would have been objectively apparent to a reasonable officer, including age in the custody analysis is consistent with the *Miranda* test's objective nature. This does not mean that a child's age will be a determinative, or even a significant, factor in every case, but it is a reality that courts cannot ignore. Pp. 8–14.

(c) Additional arguments that the State and its *amici* offer for excluding age from the custody inquiry are unpersuasive. Pp. 14–18.

(d) On remand, the state courts are to address the question whether J. D. B. was in custody when he was interrogated, taking account of all of the relevant circumstances of the interrogation, including J. D. B.'s age at the time. P. 18.

363 N. C. 664, 686 S. E. 2d 135, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and KAGAN, JJ., joined. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA and THOMAS, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–11121

J. D. B., PETITIONER *v.* NORTH CAROLINA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NORTH CAROLINA

[June 16, 2011]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

This case presents the question whether the age of a child subjected to police questioning is relevant to the custody analysis of *Miranda* v. *Arizona,* 384 U. S. 436 (1966). It is beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave. Seeing no reason for police officers or courts to blind themselves to that commonsense reality, we hold that a child's age properly informs the *Miranda* custody analysis.

I

A

Petitioner J. D. B. was a 13-year-old, seventh-grade student attending class at Smith Middle School in Chapel Hill, North Carolina when he was removed from his classroom by a uniformed police officer, escorted to a closed-door conference room, and questioned by police for at least half an hour.

This was the second time that police questioned J. D. B. in the span of a week. Five days earlier, two home break-ins occurred, and various items were stolen. Police stopped and questioned J. D. B. after he was seen behind a

residence in the neighborhood where the crimes occurred. That same day, police also spoke to J. D. B.'s grandmother—his legal guardian—as well as his aunt.

Police later learned that a digital camera matching the description of one of the stolen items had been found at J. D. B.'s middle school and seen in J. D. B.'s possession. Investigator DiCostanzo, the juvenile investigator with the local police force who had been assigned to the case, went to the school to question J. D. B. Upon arrival, DiCostanzo informed the uniformed police officer on detail to the school (a so-called school resource officer), the assistant principal, and an administrative intern that he was there to question J. D. B. about the break-ins. Although DiCostanzo asked the school administrators to verify J. D. B.'s date of birth, address, and parent contact information from school records, neither the police officers nor the school administrators contacted J. D. B.'s grandmother.

The uniformed officer interrupted J. D. B.'s afternoon social studies class, removed J. D. B. from the classroom, and escorted him to a school conference room.[1] There, J. D. B. was met by DiCostanzo, the assistant principal, and the administrative intern. The door to the conference room was closed. With the two police officers and the two administrators present, J. D. B. was questioned for the next 30 to 45 minutes. Prior to the commencement of questioning, J. D. B. was given neither *Miranda* warnings nor the opportunity to speak to his grandmother. Nor was he informed that he was free to leave the room.

Questioning began with small talk—discussion of sports and J. D. B.'s family life. DiCostanzo asked, and J. D. B.

—————

[1] Although the State suggests that the "record is unclear as to who brought J. D. B. to the conference room, and the trial court made no factual findings on this specific point," Brief for Respondent 3, n. 1, the State agreed at the certiorari stage that "the SRO [school resource officer] escorted petitioner" to the room, Brief in Opposition 3.

agreed, to discuss the events of the prior weekend. Denying any wrongdoing, J. D. B. explained that he had been in the neighborhood where the crimes occurred because he was seeking work mowing lawns. DiCostanzo pressed J. D. B. for additional detail about his efforts to obtain work; asked J. D. B. to explain a prior incident, when one of the victims returned home to find J. D. B. behind her house; and confronted J. D. B. with the stolen camera. The assistant principal urged J. D. B. to "do the right thing," warning J. D. B. that "the truth always comes out in the end." App. 99a, 112a.

Eventually, J. D. B. asked whether he would "still be in trouble" if he returned the "stuff." *Ibid.* In response, DiCostanzo explained that return of the stolen items would be helpful, but "this thing is going to court" regardless. *Id.*, at 112a; *ibid.* ("[W]hat's done is done[;] now you need to help yourself by making it right"); see also *id.*, at 99a. DiCostanzo then warned that he may need to seek a secure custody order if he believed that J. D. B. would continue to break into other homes. When J. D. B. asked what a secure custody order was, DiCostanzo explained that "it's where you get sent to juvenile detention before court." *Id.*, at 112a.

After learning of the prospect of juvenile detention, J. D. B. confessed that he and a friend were responsible for the break-ins. DiCostanzo only then informed J. D. B. that he could refuse to answer the investigator's questions and that he was free to leave.[2] Asked whether he under-

---

[2] The North Carolina Supreme Court noted that the trial court's factual findings were "uncontested and therefore . . . binding" on it. *In re J. D. B.*, 363 N. C. 664, 668, 686 S. E. 2d 135, 137 (2009). The court described the sequence of events set forth in the text. See *id.,* at 670–671, 686 S. E. 2d, at 139. ("Immediately following J. D. B.'s initial confession, Investigator DiCostanzo informed J. D. B. that he did not have to speak with him and that he was free to leave" (internal quotation marks and alterations omitted)). Though less than perfectly

stood, J. D. B. nodded and provided further detail, including information about the location of the stolen items. Eventually J. D. B. wrote a statement, at DiCostanzo's request. When the bell rang indicating the end of the schoolday, J. D. B. was allowed to leave to catch the bus home.

B

Two juvenile petitions were filed against J. D. B., each alleging one count of breaking and entering and one count of larceny. J. D. B.'s public defender moved to suppress his statements and the evidence derived therefrom, arguing that suppression was necessary because J. D. B. had been "interrogated by police in a custodial setting without being afforded *Miranda* warning[s]," App. 89a, and because his statements were involuntary under the totality of the circumstances test, *id.*, at 142a; see *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 226 (1973) (due process precludes admission of a confession where "a defendant's will was overborne" by the circumstances of the interrogation). After a suppression hearing at which DiCostanzo and J. D. B. testified, the trial court denied the motion, deciding that J. D. B. was not in custody at the time of the schoolhouse interrogation and that his statements were voluntary. As a result, J. D. B. entered a transcript of admission to all four counts, renewing his objection to the denial of his motion to suppress, and the court adjudicated J. D. B. delinquent.

—————

explicit, the trial court's order indicates a finding that J. D. B. initially confessed prior to DiCostanzo's warnings. See App. 99a.

Nonetheless, both parties' submissions to this Court suggest that the warnings came after DiCostanzo raised the possibility of a secure custody order but before J. D. B. confessed for the first time. See Brief for Petitioner 5; Brief for Respondent 5. Because we remand for a determination whether J. D. B. was in custody under the proper analysis, the state courts remain free to revisit whether the trial court made a conclusive finding of fact in this respect.

A divided panel of the North Carolina Court of Appeals affirmed. *In re J. D. B.*, 196 N. C. App. 234, 674 S. E. 2d 795 (2009). The North Carolina Supreme Court held, over two dissents, that J. D. B. was not in custody when he confessed, "declin[ing] to extend the test for custody to include consideration of the age . . . of an individual subjected to questioning by police." *In re J. D. B.*, 363 N. C. 664, 672, 686 S. E. 2d 135, 140 (2009).[3]

We granted certiorari to determine whether the *Miranda* custody analysis includes consideration of a juvenile suspect's age. 562 U. S. ___ (2010).

## II

### A

Any police interview of an individual suspected of a crime has "coercive aspects to it." *Oregon* v. *Mathiason*, 429 U. S. 492, 495 (1977) *(per curiam)*. Only those interrogations that occur while a suspect is in police custody, however, "heighte[n] the risk" that statements obtained are not the product of the suspect's free choice. *Dickerson* v. *United States*, 530 U. S. 428, 435 (2000).

By its very nature, custodial police interrogation entails "inherently compelling pressures." *Miranda*, 384 U. S., at 467. Even for an adult, the physical and psychological isolation of custodial interrogation can "undermine the individual's will to resist and . . . compel him to speak where he would not otherwise do so freely." *Ibid.* Indeed, the pressure of custodial interrogation is so immense that it "can induce a frighteningly high percentage of people to confess to crimes they never committed." *Corley* v. *United States*, 556 U. S. __, __ (2009) (slip op., at 16) (citing Drizin

———————

[3] J. D. B.'s challenge in the North Carolina Supreme Court focused on the lower courts' conclusion that he was not in custody for purposes of *Miranda* v. *Arizona*, 384 U. S. 436 (1966). The North Carolina Supreme Court did not address the trial court's holding that the statements were voluntary, and that question is not before us.

& Leo, The Problem of False Confessions in the Post-DNA World, 82 N. C. L. Rev. 891, 906–907 (2004)); see also *Miranda*, 384 U. S., at 455, n. 23. That risk is all the more troubling—and recent studies suggest, all the more acute—when the subject of custodial interrogation is a juvenile. See Brief for Center on Wrongful Convictions of Youth et al. as *Amici Curiae* 21–22 (collecting empirical studies that "illustrate the heightened risk of false confessions from youth").

Recognizing that the inherently coercive nature of custodial interrogation "blurs the line between voluntary and involuntary statements," *Dickerson*, 530 U. S., at 435, this Court in *Miranda* adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination. Prior to questioning, a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U. S., at 444; see also *Florida* v. *Powell*, 559 U. S. ___, ___ (2010) (slip op., at 8) ("The four warnings *Miranda* requires are invariable, but this Court has not dictated the words in which the essential information must be conveyed"). And, if a suspect makes a statement during custodial interrogation, the burden is on the Government to show, as a "prerequisit[e]" to the statement's admissibility as evidence in the Government's case in chief, that the defendant "voluntarily, knowingly and intelligently" waived his rights.[4] *Miranda*, 384 U. S., at 444, 475–476; *Dickerson*, 530 U. S., at 443–444.

--------

[4] *Amici* on behalf of J. D. B. question whether children of all ages can comprehend *Miranda* warnings and suggest that additional procedural safeguards may be necessary to protect their *Miranda* rights. Brief for Juvenile Law Center et al. as *Amici Curiae* 13–14, n. 7. Whatever the merit of that contention, it has no relevance here, where no *Miranda* warnings were administered at all.

Because these measures protect the individual against the coercive nature of custodial interrogation, they are required "'only where there has been such a restriction on a person's freedom as to render him "in custody."'" *Stansbury* v. *California*, 511 U. S. 318, 322 (1994) *(per curiam)* (quoting *Oregon* v. *Mathiason*, 429 U. S. 492, 495 (1977) *(per curiam))*.   As we have repeatedly emphasized, whether a suspect is "in custody" is an objective inquiry.

> "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson* v. *Keohane*, 516 U. S. 99, 112 (1995) (internal quotation marks, alteration, and footnote omitted).

See also *Yarborough* v. *Alvarado*, 541 U. S. 652, 662–663 (2004); *Stansbury*, 511 U. S., at 323; *Berkemer* v. *McCarty*, 468 U. S. 420, 442, and n. 35 (1984).  Rather than demarcate a limited set of relevant circumstances, we have required police officers and courts to "examine all of the circumstances surrounding the interrogation," *Stansbury*, 511 U. S., at 322, including any circumstance that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave," *id.*, at 325.  On the other hand, the "subjective views harbored by either the interrogating officers or the person being questioned" are irrelevant. *Id.*, at 323.  The test, in other words, involves no consideration of the "actual mindset" of the particular suspect subjected to police questioning. *Alvarado*, 541 U. S., at 667; see also *California* v. *Beheler*,

463 U. S. 1121, 1125, n. 3 (1983) *(per curiam)*.

The benefit of the objective custody analysis is that it is "designed to give clear guidance to the police." *Alvarado*, 541 U. S., at 668. But see *Berkemer*, 468 U. S., at 441 (recognizing the "occasiona[l] . . . difficulty" that police and courts nonetheless have in "deciding exactly when a suspect has been taken into custody"). Police must make in-the-moment judgments as to when to administer *Miranda* warnings. By limiting analysis to the objective circumstances of the interrogation, and asking how a reasonable person in the suspect's position would understand his freedom to terminate questioning and leave, the objective test avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind. See *id.,* at 430–431 (officers are not required to "make guesses" as to circumstances "unknowable" to them at the time); *Alvarado*, 541 U. S., at 668 (officers are under no duty "to consider . . . contingent psychological factors when deciding when suspects should be advised of their *Miranda* rights").

B

The State and its *amici* contend that a child's age has no place in the custody analysis, no matter how young the child subjected to police questioning. We cannot agree. In some circumstances, a child's age "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave." *Stansbury*, 511 U. S., at 325. That is, a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go. We think it clear that courts can account for that reality without doing any damage to the objective nature of the custody analysis.

A child's age is far "more than a chronological fact."

*Eddings* v. *Oklahoma*, 455 U. S. 104, 115 (1982); accord, *Gall* v. *United States*, 552 U. S. 38, 58 (2007); *Roper* v. *Simmons*, 543 U. S. 551, 569 (2005); *Johnson* v. *Texas*, 509 U. S. 350, 367 (1993). It is a fact that "generates common-sense conclusions about behavior and perception." *Alvarado*, 541 U. S., at 674 (BREYER, J., dissenting). Such conclusions apply broadly to children as a class. And, they are self-evident to anyone who was a child once himself, including any police officer or judge.

Time and again, this Court has drawn these common-sense conclusions for itself. We have observed that children "generally are less mature and responsible than adults," *Eddings*, 455 U. S., at 115–116; that they "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them," *Bellotti* v. *Baird*, 443 U. S. 622, 635 (1979) (plurality opinion); that they "are more vulnerable or susceptible to . . . outside pressures" than adults, *Roper*, 543 U. S., at 569; and so on. See *Graham* v. *Florida*, 560 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 17) (finding no reason to "reconsider" these observations about the common "nature of juveniles"). Addressing the specific context of police interrogation, we have observed that events that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Haley* v. *Ohio*, 332 U. S. 596, 599 (1948) (plurality opinion); see also *Gallegos* v. *Colorado*, 370 U. S. 49, 54 (1962) ("[N]o matter how sophisticated," a juvenile subject of police interrogation "cannot be compared" to an adult subject). Describing no one child in particular, these observations restate what "any parent knows"—indeed, what any person knows—about children generally. *Roper*, 543 U. S., at 569.[5]

———————

[5] Although citation to social science and cognitive science authorities is unnecessary to establish these commonsense propositions, the literature confirms what experience bears out. See, *e.g.*, *Graham* v.

Our various statements to this effect are far from
unique. The law has historically reflected the same as-
sumption that children characteristically lack the capacity
to exercise mature judgment and possess only an incom-
plete ability to understand the world around them. See,
*e.g.*, 1 W. Blackstone, Commentaries on the Laws of Eng-
land *464–*465 (hereinafter Blackstone) (explaining that
limits on children's legal capacity under the common law
"secure them from hurting themselves by their own im-
provident acts"). Like this Court's own generalizations,
the legal disqualifications placed on children as a class—
*e.g.*, limitations on their ability to alienate property, enter
a binding contract enforceable against them, and marry
without parental consent—exhibit the settled understand-
ing that the differentiating characteristics of youth are
universal.[6]

Indeed, even where a "reasonable person" standard

––––––––––

*Florida*, 560 U. S. ___, ___ (2010) (slip op., at 17) ("[D]evelopments in
psychology and brain science continue to show fundamental differences
between juvenile and adult minds").

[6] See, *e.g.*, 1 E. Farnsworth, Contracts §4.4, p. 379, and n. 1 (1990)
("Common law courts early announced the prevailing view that a
minor's contract is 'voidable' at the instance of the minor" (citing 8 W.
Holdsworth, History of English Law 51 (1926))); 1 D. Kramer, Legal
Rights of Children §8.1, p. 663 (rev. 2d ed. 2005) ("[W]hile minor
children have the right to acquire and own property, they are consid-
ered incapable of property management" (footnote omitted)); 2 J. Kent,
Commentaries on American Law *78–*79, *90 (G. Comstock ed., 11th
ed. 1867); see generally *id.,* at *233 (explaining that, under the common
law, "[t]he necessity of guardians results from the inability of infants to
take care of themselves . . . and this inability continues, in contempla-
tion of law, until the infant has attained the age of [21]"); 1 Blackstone
*465 ("It is generally true, that an infant can neither aliene his lands,
nor do any legal act, nor make a deed, nor indeed any manner of
contract, that will bind him"); *Roper* v. *Simmons*, 543 U. S. 551, 569
(2005) ("In recognition of the comparative immaturity and irresponsi-
bility of juveniles, almost every State prohibits those under 18 years
of age from voting, serving on juries, or marrying without parental
consent").

otherwise applies, the common law has reflected the reality that children are not adults. In negligence suits, for instance, where liability turns on what an objectively reasonable person would do in the circumstances, "[a]ll American jurisdictions accept the idea that a person's childhood is a relevant circumstance" to be considered. Restatement (Third) of Torts §10, Comment *b*, p. 117 (2005); see also *id.*, Reporters' Note, pp. 121–122 (collecting cases); Restatement (Second) of Torts §283A, Comment *b*, p. 15 (1963–1964) ("[T]here is a wide basis of community experience upon which it is possible, as a practical matter, to determine what is to be expected of [children]").

As this discussion establishes, "[o]ur history is replete with laws and judicial recognition" that children cannot be viewed simply as miniature adults. *Eddings*, 455 U. S., at 115–116. We see no justification for taking a different course here. So long as the child's age was known to the officer at the time of the interview, or would have been objectively apparent to any reasonable officer, including age as part of the custody analysis requires officers neither to consider circumstances "unknowable" to them, *Berkemer*, 468 U. S., at 430, nor to "anticipat[e] the frailties or idiosyncrasies" of the particular suspect whom they question, *Alvarado*, 541 U. S., at 662 (internal quotation marks omitted). The same "wide basis of community experience" that makes it possible, as an objective matter, "to determine what is to be expected" of children in other contexts, Restatement (Second) of Torts §283A, at 15; see *supra*, at 10, and n. 6, likewise makes it possible to know what to expect of children subjected to police questioning.

In other words, a child's age differs from other personal characteristics that, even when known to police, have no objectively discernible relationship to a reasonable person's understanding of his freedom of action. *Alvarado*, holds, for instance, that a suspect's prior interrogation

history with law enforcement has no role to play in the
custody analysis because such experience could just as
easily lead a reasonable person to feel free to walk away
as to feel compelled to stay in place. 541 U. S., at 668.
Because the effect in any given case would be "contingent
[on the] psycholog[y]" of the individual suspect, the Court
explained, such experience cannot be considered without
compromising the objective nature of the custody analysis.
*Ibid.* A child's age, however, is different. Precisely be-
cause childhood yields objective conclusions like those we
have drawn ourselves—among others, that children are
"most susceptible to influence," *Eddings*, 455 U. S., at 115,
and "outside pressures," *Roper*, 543 U. S., at 569—
considering age in the custody analysis in no way involves
a determination of how youth "subjectively affect[s] the
mindset" of any particular child, Brief for Respondent 14.[7]

In fact, in many cases involving juvenile suspects, the
custody analysis would be nonsensical absent some con-
sideration of the suspect's age. This case is a prime exam-
ple. Were the court precluded from taking J. D. B.'s youth
into account, it would be forced to evaluate the circum-
stances present here through the eyes of a reasonable
person of average years. In other words, how would a
reasonable adult understand his situation, after being
removed from a seventh-grade social studies class by a
uniformed school resource officer; being encouraged by his
assistant principal to "do the right thing"; and being
warned by a police investigator of the prospect of juvenile
detention and separation from his guardian and primary
caretaker? To describe such an inquiry is to demonstrate

───────────

[7] Thus, contrary to the dissent's protestations, today's holding neither
invites consideration of whether a particular suspect is "unusually
meek or compliant," *post*, at 9 (opinion of ALITO, J.), nor "expan[ds]" the
*Miranda* custody analysis, *post*, at 8, into a test that requires officers to
anticipate and account for a suspect's every personal characteristic, see
*post*, at 11–12.

its absurdity. Neither officers nor courts can reasonably evaluate the effect of objective circumstances that, by their nature, are specific to children without accounting for the age of the child subjected to those circumstances.

Indeed, although the dissent suggests that concerns "regarding the application of the *Miranda* custody rule to minors can be accommodated by considering the unique circumstances present when minors are questioned in school," *post*, at 17 (opinion of ALITO, J.), the effect of the schoolhouse setting cannot be disentangled from the identity of the person questioned. A student—whose presence at school is compulsory and whose disobedience at school is cause for disciplinary action—is in a far different position than, say, a parent volunteer on school grounds to chaperone an event, or an adult from the community on school grounds to attend a basketball game. Without asking whether the person "questioned in school" is a "minor," *ibid.,* the coercive effect of the schoolhouse setting is unknowable.

Our prior decision in *Alvarado* in no way undermines these conclusions. In that case, we held that a state-court decision that failed to mention a 17-year-old's age as part of the *Miranda* custody analysis was not objectively unreasonable under the deferential standard of review set forth by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214. Like the North Carolina Supreme Court here, see 363 N. C., at 672, 686 S. E. 2d, at 140, we observed that accounting for a juvenile's age in the *Miranda* custody analysis "could be viewed as creating a subjective inquiry," 541 U. S., at 668. We said nothing, however, of whether such a view would be correct under the law. Cf. *Renico* v. *Lett*, 559 U. S. ___, ___, n. 3 (2010) (slip op., at 11, n. 3) ("[W]hether the [state court] was right or wrong is not the pertinent question under AEDPA"). To the contrary, Justice O'Connor's concurring opinion explained that a suspect's age may

indeed "be relevant to the 'custody' inquiry." *Alvarado*, 541 U. S., at 669.

Reviewing the question *de novo* today, we hold that so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test.[8] This is not to say that a child's age will be a determinative, or even a significant, factor in every case. Cf. *ibid.* (O'Connor, J., concurring) (explaining that a state-court decision omitting any mention of the defendant's age was not unreasonable under AEDPA's deferential standard of review where the defendant "was almost 18 years old at the time of his interview"); *post*, at 17 (suggesting that "teenagers nearing the age of majority" are likely to react to an interrogation as would a "typical 18-year-old in similar circumstances"). It is, however, a reality that courts cannot simply ignore.

## III

The State and its *amici* offer numerous reasons that courts must blind themselves to a juvenile defendant's age. None is persuasive.

To start, the State contends that a child's age must be

---

[8] This approach does not undermine the basic principle that an interrogating officer's unarticulated, internal thoughts are never—in and of themselves—objective circumstances of an interrogation. See *supra*, at 7; *Stansbury* v. *California*, 511 U. S. 318, 323 (1994) *(per curiam).* Unlike a child's youth, an officer's purely internal thoughts have no conceivable effect on how a reasonable person in the suspect's position would understand his freedom of action. See *id.*, at 323–325; *Berkemer* v. *McCarty*, 468 U. S. 420, 442 (1984). Rather than "overtur[n]" that settled principle, *post*, at 13, the limitation that a child's age may inform the custody analysis only when known or knowable simply reflects our  unwillingness to require officers to "make guesses" as to circumstances "unknowable" to them in deciding when to give *Miranda* warnings, *Berkemer*, 468 U. S., at 430–431.

excluded from the custody inquiry because age is a personal characteristic specific to the suspect himself rather than an "external" circumstance of the interrogation. Brief for Respondent 21; see also *id.*, at 18–19 (distinguishing "personal characteristics" from "objective facts related to the interrogation itself" such as the location and duration of the interrogation). Despite the supposed significance of this distinction, however, at oral argument counsel for the State suggested without hesitation that at least some undeniably personal characteristics—for instance, whether the individual being questioned is blind—are circumstances relevant to the custody analysis. See Tr. of Oral Arg. 41. Thus, the State's quarrel cannot be that age is a personal characteristic, without more.[9]

The State further argues that age is irrelevant to the custody analysis because it "go[es] to how a suspect may internalize and perceive the circumstances of an interrogation." Brief for Respondent 12; see also Brief for United States as *Amicus Curiae* 21 (hereinafter U. S. Brief) (arguing that a child's age has no place in the custody analysis because it goes to whether a suspect is "particularly susceptible" to the external circumstances of the interrogation (some internal quotation marks omitted)). But the same can be said of every objective circumstance that the State agrees is relevant to the custody analysis: Each circumstance goes to how a reasonable person would "internalize and perceive" every other. See, *e.g.*, *Stansbury*, 511 U. S., at 325. Indeed, this is the very reason that we ask whether the objective circumstances "add up to custody,"

—————

[9] The State's purported distinction between blindness and age—that taking account of a suspect's youth requires a court "to get into the mind" of the child, whereas taking account of a suspect's blindness does not, Tr. of Oral Arg. 41–42—is mistaken. In either case, the question becomes how a reasonable person would understand the circumstances, either from the perspective of a blind person or, as here, a 13-year-old child.

*Keohane*, 516 U. S., at 113, instead of evaluating the circumstances one by one.

In the same vein, the State and its *amici* protest that the "effect of . . . age on [the] perception of custody is internal," Brief for Respondent 20, or "psychological," U. S. Brief 21. But the whole point of the custody analysis is to determine whether, given the circumstances, "a reasonable person [would] have felt he or she was . . . at liberty to terminate the interrogation and leave." *Keohane*, 516 U. S., at 112. Because the *Miranda* custody inquiry turns on the mindset of a reasonable person in the suspect's position, it cannot be the case that a circumstance is subjective simply because it has an "internal" or "psychological" impact on perception. Were that so, there would be no objective circumstances to consider at all.

Relying on our statements that the objective custody test is "designed to give clear guidance to the police," *Alvarado*, 541 U. S., at 668, the State next argues that a child's age must be excluded from the analysis in order to preserve clarity. Similarly, the dissent insists that the clarity of the custody analysis will be destroyed unless a "one-size-fits-all reasonable-person test" applies. *Post*, at 13. In reality, however, ignoring a juvenile defendant's age will often make the inquiry more artificial, see *supra*, at 12–13, and thus only add confusion. And in any event, a child's age, when known or apparent, is hardly an obscure factor to assess. Though the State and the dissent worry about gradations among children of different ages, that concern cannot justify ignoring a child's age altogether. Just as police officers are competent to account for other objective circumstances that are a matter of degree such as the length of questioning or the number of officers present, so too are they competent to evaluate the effect of relative age. Indeed, they are competent to do so even though an interrogation room lacks the "reflective atmosphere of a [jury] deliberation room," *post*, at 15. The same

is true of judges, including those whose childhoods have long since passed, see *post*, at 14. In short, officers and judges need no imaginative powers, knowledge of developmental psychology, training in cognitive science, or expertise in social and cultural anthropology to account for a child's age. They simply need the common sense to know that a 7-year-old is not a 13-year-old and neither is an adult.

There is, however, an even more fundamental flaw with the State's plea for clarity and the dissent's singular focus on simplifying the analysis: Not once have we excluded from the custody analysis a circumstance that we determined was relevant and objective, simply to make the fault line between custodial and noncustodial "brighter." Indeed, were the guiding concern clarity and nothing else, the custody test would presumably ask only whether the suspect had been placed under formal arrest. *Berkemer*, 468 U. S., at 441; see *ibid.* (acknowledging the "occasiona[l] . . . difficulty" police officers confront in determining when a suspect has been taken into custody). But we have rejected that "more easily administered line," recognizing that it would simply "enable the police to circumvent the constraints on custodial interrogations established by *Miranda*." *Ibid.;* see also *ibid.,* n. 33.[10]

Finally, the State and the dissent suggest that excluding

––––––––––

[10] Contrary to the dissent's intimation, see *post*, at 8, *Miranda* does not answer the question whether a child's age is an objective circumstance relevant to the custody analysis. *Miranda* simply holds that warnings must be given once a suspect is in custody, without "paus[ing] to inquire in individual cases whether the defendant was aware of his rights without a warning being given." 384 U. S., at 468; see also *id.*, at 468–469 ("Assessments of the knowledge the defendant possessed, based on information as to age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact" (footnote omitted)). That conclusion says nothing about whether age properly informs whether a child is in custody in the first place.

age from the custody analysis comes at no cost to juveniles' constitutional rights because the due process voluntariness test independently accounts for a child's youth. To be sure, that test permits consideration of a child's age, and it erects its own barrier to admission of a defendant's inculpatory statements at trial. See *Gallegos*, 370 U. S., at 53–55; *Haley*, 332 U. S., at 599–601; see also *post*, at 17–18 ("[C]ourts should be instructed to take particular care to ensure that [young children's] incriminating statements were not obtained involuntarily"). But *Miranda*'s procedural safeguards exist precisely because the voluntariness test is an inadequate barrier when custodial interrogation is at stake. See 384 U. S., at 458 ("Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice"); *Dickerson*, 530 U. S., at 442 ("[R]eliance on the traditional totality-of-the-circumstances test raise[s] a risk of overlooking an involuntary custodial confession"); see also *supra*, at 5–6. To hold, as the State requests, that a child's age is never relevant to whether a suspect has been taken into custody—and thus to ignore the very real differences between children and adults—would be to deny children the full scope of the procedural safeguards that *Miranda* guarantees to adults.

*          *          *

The question remains whether J. D. B. was in custody when police interrogated him. We remand for the state courts to address that question, this time taking account of all of the relevant circumstances of the interrogation, including J. D. B.'s age at the time. The judgment of the North Carolina Supreme Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 09–11121

———————

## J. D. B., PETITIONER *v.* NORTH CAROLINA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NORTH CAROLINA

[June 16, 2011]

JUSTICE ALITO, with whom THE CHIEF JUSTICE, JUSTICE
SCALIA, and JUSTICE THOMAS join, dissenting.

The Court's decision in this case may seem on first
consideration to be modest and sensible, but in truth it
is neither. It is fundamentally inconsistent with one of the
main justifications for the *Miranda*[1] rule: the perceived
need for a clear rule that can be easily applied in all cases.
And today's holding is not needed to protect the constitu-
tional rights of minors who are questioned by the police.

*Miranda*'s prophylactic regime places a high value on
clarity and certainty. Dissatisfied with the highly fact-
specific constitutional rule against the admission of in-
voluntary confessions, the *Miranda* Court set down rigid
standards that often require courts to ignore personal
characteristics that may be highly relevant to a particular
suspect's actual susceptibility to police pressure. This
rigidity, however, has brought with it one of *Miranda*'s
principal strengths—"the ease and clarity of its applica-
tion" by law enforcement officials and courts. See *Moran*
v. *Burbine*, 475 U. S. 412, 425–426 (1986). A key contribu-
tor to this clarity, at least up until now, has been
*Miranda*'s objective reasonable-person test for determin-
ing custody.

*Miranda*'s custody requirement is based on the proposi-

———————

[1] See *Miranda* v. *Arizona*, 384 U. S. 436 (1966).

tion that the risk of unconstitutional coercion is heightened when a suspect is placed under formal arrest or is subjected to some functionally equivalent limitation on freedom of movement. When this custodial threshold is reached, *Miranda* warnings must precede police questioning. But in the interest of simplicity, the custody analysis considers only whether, under the circumstances, a hypothetical reasonable person would consider himself to be confined.

Many suspects, of course, will differ from this hypothetical reasonable person. Some, including those who have been hardened by past interrogations, may have no need for *Miranda* warnings at all. And for other suspects— those who are unusually sensitive to the pressures of police questioning—*Miranda* warnings may come too late to be of any use. That is a necessary consequence of *Miranda*'s rigid standards, but it does not mean that the constitutional rights of these especially sensitive suspects are left unprotected. A vulnerable defendant can still turn to the constitutional rule against *actual* coercion and contend that that his confession was extracted against his will.

Today's decision shifts the *Miranda* custody determination from a one-size-fits-all reasonable-person test into an inquiry that must account for at least one individualized characteristic—age—that is thought to correlate with susceptibility to coercive pressures. Age, however, is in no way the only personal characteristic that may correlate with pliability, and in future cases the Court will be forced to choose between two unpalatable alternatives. It may choose to limit today's decision by arbitrarily distinguishing a suspect's age from other personal characteristics— such as intelligence, education, occupation, or prior experience with law enforcement—that may also correlate with susceptibility to coercive pressures. Or, if the Court is unwilling to draw these arbitrary lines, it will be forced

to effect a fundamental transformation of the *Miranda* custody test—from a clear, easily applied prophylactic rule into a highly fact-intensive standard resembling the voluntariness test that the *Miranda* Court found to be unsatisfactory.

For at least three reasons, there is no need to go down this road. First, many minors subjected to police interrogation are near the age of majority, and for these suspects the one-size-fits-all *Miranda* custody rule may not be a bad fit. Second, many of the difficulties in applying the *Miranda* custody rule to minors arise because of the unique circumstances present when the police conduct interrogations at school. The *Miranda* custody rule has always taken into account the setting in which questioning occurs, and accounting for the school setting in such cases will address many of these problems. Third, in cases like the one now before us, where the suspect is especially young, courts applying the constitutional voluntariness standard can take special care to ensure that incriminating statements were not obtained through coercion.

Safeguarding the constitutional rights of minors does not require the extreme makeover of *Miranda* that today's decision may portend.

## I

In the days before *Miranda*, this Court's sole metric for evaluating the admissibility of confessions was a voluntariness standard rooted in both the Fifth Amendment's Self-Incrimination Clause and the Due Process Clause of the Fourteenth Amendment. See *Bram* v. *United States*, 168 U. S. 532, 542 (1897) (Self-Incrimination Clause); *Brown* v. *Mississippi*, 297 U. S. 278 (1936) (due process). The question in these voluntariness cases was whether the particular "defendant's will" had been "overborne." *Lynumn* v. *Illinois*, 372 U. S. 528, 534 (1963). Courts took into account both "the details of the interrogation" *and*

"the characteristics of the accused," *Schneckloth* v. *Busta-monte*, 412 U. S. 218, 226 (1973), and then "weigh[ed] . . . the circumstances of pressure against the power of resistance of the person confessing." *Stein* v. *New York*, 346 U. S. 156, 185 (1953).

All manner of individualized, personal characteristics were relevant in this voluntariness inquiry. Among the most frequently mentioned factors were the defendant's education, physical condition, intelligence, and mental health. *Withrow* v. *Williams*, 507 U. S. 680, 693 (1993); see *Clewis* v. *Texas*, 386 U. S. 707, 712 (1967) ("only a fifth-grade education"); *Greenwald* v. *Wisconsin*, 390 U. S. 519, 520–521 (1968) *(per curiam)* (had not taken blood-pressure medication); *Payne* v. *Arkansas*, 356 U. S. 560, 562, n. 4, 567 (1958) ("mentally dull" and "'slow to learn'"); *Fikes* v. *Alabama*, 352 U. S. 191, 193, 196, 198 (1957) ("low mentality, if not mentally ill"). The suspect's age also received prominent attention in several cases, *e.g.*, *Gallegos* v. *Colorado*, 370 U. S. 49, 54 (1962), especially when the suspect was a "mere child." *Haley* v. *Ohio*, 332 U. S. 596, 599 (1948) (plurality opinion). The weight assigned to any one consideration varied from case to case. But all of these factors, along with anything else that might have affected the "individual's . . . capacity for effective choice," were relevant in determining whether the confession was coerced or compelled. See *Miranda* v. *Arizona,* 384 U. S. 436, 506–507 (1966) (Harlan, J., dissenting).

The all-encompassing nature of the voluntariness inquiry had its benefits. It allowed courts to accommodate a "complex of values," *Schneckloth, supra*, at 223, 224, and to make a careful, highly individualized determination as to whether the police had wrung "a confession out of [the] accused against his will." *Blackburn* v. *Alabama*, 361 U. S. 199, 206–207 (1960). But with this flexibility came a decrease in both certainty and predictability, and the

voluntariness standard proved difficult "for law enforcement officers to conform to, and for courts to apply in a consistent manner." *Dickerson* v. *United States*, 530 U. S. 428, 444 (2000).

In *Miranda*, the Court supplemented the voluntariness inquiry with a "set of prophylactic measures" designed to ward off the "'inherently compelling pressures' of custodial interrogation." See *Maryland* v. *Shatzer*, 559 U. S. \_\_, \_\_ (2010) (slip op., at 4) (quoting *Miranda*, 384 U. S., at 467). *Miranda* greatly simplified matters by requiring police to give suspects standard warnings before commencing any custodial interrogation. See *id.,* at 479. Its requirements are no doubt "rigid," see *Fare* v. *Michael C.*, 439 U. S. 1310, 1314 (1978) (Rehnquist, J., in chambers), and they often require courts to suppress "trustworthy and highly probative" statements that may be perfectly "voluntary under [a] traditional Fifth Amendment analysis." *Fare* v. *Michael C.*, 442 U. S. 707, 718 (1979). But with this rigidity comes increased clarity. *Miranda* provides "a workable rule to guide police officers," *New York* v. *Quarles*, 467 U. S. 649, 658 (1984) (internal quotation marks omitted), and an administrable standard for the courts. As has often been recognized, this gain in clarity and administrability is one of *Miranda*'s "principal advantages." *Berkemer* v. *McCarty*, 468 U. S. 420, 430 (1984); see also *Missouri* v. *Seibert*, 542 U. S. 600, 622 (2004) (KENNEDY, J., concurring in judgment).

No less than other facets of *Miranda*, the threshold requirement that the suspect be in "custody" is "designed to give clear guidance to the police." *Yarborough* v. *Alvarado*, 541 U. S. 652, 668, 669 (2004). Custody under *Miranda* attaches where there is a "formal arrest" or a "restraint on freedom of movement" akin to formal arrest. *California* v. *Beheler*, 463 U. S. 1121, 1125 (1983) *(per curiam)* (internal quotation marks omitted). This standard is "objective" and turns on how a hypothetical "rea-

sonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Stansbury* v. *California*, 511 U. S. 318, 322–323, 325 (1994) *(per curiam)* (internal quotation marks omitted).

Until today, the Court's cases applying this test have focused solely on the "objective circumstances of the interrogation," *id.*, at 323, not the personal characteristics of the interrogated. *E.g.*, *Berkemer*, *supra*, at 442, and n. 35; but cf. *Schneckloth*, 412 U. S., at 226 (voluntariness inquiry requires consideration of "the details of the interrogation" *and* "the characteristics of the accused"). Relevant factors have included such things as where the questioning occurred,[2] how long it lasted,[3] what was said,[4] any physical restraints placed on the suspect's movement,[5] and whether the suspect was allowed to leave when the questioning was through.[6]   The totality of *these* circumstances—the external circumstances, that is, of the interrogation itself—is what has mattered in this Court's cases.   Personal characteristics of suspects have consistently been rejected or ignored as irrelevant under a one-size-fits-all reasonable-person standard. *Stansbury, supra,* at 323 ("[C]ustody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned").

For example, in *Berkemer* v. *McCarty, supra*, police officers conducting a traffic stop questioned a man who had been drinking and smoking marijuana before he was pulled over. *Id.,* at 423.   Although the suspect's inebria-

_____

[2] *Maryland* v. *Shatzer,* 559 U. S. ___, ___ (2010) (slip op., at 13–16).

[3] *Berkemer* v. *McCarty,* 468 U. S. 420, 437–438 (1984).

[4] *Oregon* v. *Mathiason*, 429 U. S. 492, 495 (1977) *(per curiam).*

[5] *New York* v. *Quarles*, 467 U. S. 649, 655 (1984).

[6] *California* v. *Beheler*, 463 U. S. 1121, 1122–1123 (1983) *(per curiam).*

tion was readily apparent to the officers at the scene, *ibid.*, the Court's analysis did not advert to this or any other individualized consideration. Instead, the Court focused only on the external circumstances of the interrogation itself. The opinion concluded that a typical "traffic stop" is akin to a "*Terry* stop"[7] and does not qualify as the equivalent of "formal arrest." *Id.*, at 439.

*California* v. *Beheler*, *supra*, is another useful example. There, the circumstances of the interrogation were "remarkably similar" to the facts of the Court's earlier decision in *Oregon* v. *Mathiason*, 429 U. S. 492 (1977) *(per curiam)*—the suspect was "not placed under arrest," he "voluntarily [came] to the police station," and he was "allowed to leave unhindered by police after a brief interview." 463 U. S., at 1123, 1121. A California court in *Beheler* had nonetheless distinguished *Mathiason* because the police knew that Beheler "had been drinking earlier in the day" and was "emotionally distraught." 463 U. S., at 1124–1125. In a summary reversal, this Court explained that the fact "[t]hat the police knew more" personal information about Beheler than they did about Mathiason was "irrelevant." *Id.*, at 1125. Neither one of them was in custody under the objective reasonable-person standard. *Ibid.;* see also *Alvarado*, *supra,* at 668, 669 (experience with law enforcement irrelevant to *Miranda* custody analysis "as a *de novo* matter").[8]

The glaring absence of reliance on personal characteris-

_____

[7] See *Terry* v. *Ohio*, 392 U. S. 1 (1968).

[8] The Court claims that "[n]ot once" have any of our cases "excluded from the custody analysis a circumstance that we determined was relevant and objective, simply to make the fault line between custodial and noncustodial 'brighter.'" *Ante*, at 17. Surely this is incorrect. The very act of adopting a reasonable-person test necessarily excludes all sorts of "relevant and objective" circumstances—for example, all the objective circumstances of a suspect's life history—that might otherwise bear on a custody determination.

tics in these and other custody cases should come as no
surprise. To account for such individualized considera-
tions would be to contradict *Miranda*'s central premise.
The *Miranda* Court's decision to adopt its inflexible pro-
phylactic requirements was expressly based on the notion
that "[a]ssessments of the knowledge the defendant pos-
sessed, based on information as to his age, education,
intelligence, or prior contact with authorities, can never be
more than speculation." 384 U. S., at 468–469.

## II

In light of this established practice, there is no denying
that, by incorporating age into its analysis, the Court is
embarking on a new expansion of the established custody
standard. And since *Miranda* is this Court's rule, "not a
constitutional command," it is up to the Court "to justify
its expansion." Cf. *Arizona* v. *Roberson*, 486 U. S. 675, 688
(1988) (KENNEDY, J., dissenting). This the Court fails to
do.

In its present form, *Miranda*'s prophylactic regime
already imposes "high cost[s]" by requiring suppression of
confessions that are often "highly probative" and "volun-
tary" by any traditional standard. *Oregon* v. *Elstad*, 470
U. S. 298, 312 (1985); see *Dickerson,* 530 U. S., at 444
(under *Miranda* "statements which may be by no means
involuntary, made by a defendant who is aware of his
'rights,' may nonetheless be excluded and a guilty defen-
dant go free as a result"). Nonetheless, a "core virtue" of
*Miranda* has been the clarity and precision of its guidance
to "police and courts." *Withrow* v. *Williams*, 507 U. S. 680,
694 (1993) (internal quotation marks omitted); see *Moran,*
475 U. S., at 425 ("[O]ne of the principal advantages of
*Miranda* is the ease and clarity of its application" (inter-
nal quotation marks omitted)). This increased clarity "has
been thought to outweigh the burdens" that *Miranda*
imposes. *Fare*, 442 U. S., at 718. The Court has, however,

repeatedly cautioned against upsetting the careful "balance" that *Miranda* struck, *Moran, supra,* at 424, and it has "refused to sanction attempts to expand [the] *Miranda* holding" in ways that would reduce its "clarity." See *Quarles*, 467 U. S., at 658 (citing cases). Given this practice, there should be a "strong presumption" against the Court's new departure from the established custody test. See *United States* v. *Patane*, 542 U. S. 630, 640 (2004) (plurality opinion). In my judgment, that presumption cannot be overcome here.

## A

The Court's rationale for importing age into the custody standard is that minors tend to lack adults' "capacity to exercise mature judgment" and that failing to account for that "reality" will leave some minors unprotected under *Miranda* in situations where they perceive themselves to be confined. See *ante*, at 10, 8. I do not dispute that many suspects who are under 18 will be more susceptible to police pressure than the average adult. As the Court notes, our pre-*Miranda* cases were particularly attuned to this "reality" in applying the constitutional requirement of voluntariness in fact. *Ante,* at 9 (relying on *Haley,* 332 U. S., at 599 (plurality opinion), and *Gallegos*, 370 U. S., at 54). It is no less a "reality," however, that many persons *over* the age of 18 are also more susceptible to police pressure than the hypothetical reasonable person. See *Payne,* 356 U. S., at 567 (fact that defendant was a "mentally dull 19-year-old youth" relevant in voluntariness inquiry). Yet the *Miranda* custody standard has never accounted for the personal characteristics of these or any other individual defendants.

Indeed, it has always been the case under *Miranda* that the unusually meek or compliant are subject to the same fixed rules, including the same custody requirement, as those who are unusually resistant to police pressure.

*Berkemer*, 468 U. S., at 442, and n. 35 ("[O]nly relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"). *Miranda*'s rigid standards are both overinclusive and underinclusive. They are overinclusive to the extent that they provide a windfall to the most hardened and savvy of suspects, who often have no need for *Miranda*'s protections. Compare *Miranda*, *supra*, at 471–472 ("[N]o amount of circumstantial evidence that the person may have been aware of" his rights can overcome *Miranda*'s requirements), with *Orozco* v. *Texas*, 394 U. S. 324, 329 (1969) (White, J., dissenting) ("Where the defendant himself [w]as a lawyer, policeman, professional criminal, or otherwise has become aware of what his right to silence is, it is sheer fancy to assert that his answer to every question asked him is compelled unless he is advised of those rights with which he is already intimately familiar"). And *Miranda*'s requirements are underinclusive to the extent that they fail to account for "frailties," "idiosyncrasies," and other individualized considerations that might cause a person to bend more easily during a confrontation with the police. See *Alvarado*, 541 U. S., at 662 (internal quotation marks omitted). Members of this Court have seen this rigidity as a major weakness in *Miranda*'s "code of rules for confessions." See 384 U. S., at 504 (Harlan, J., dissenting); *Fare,* 439 U. S., at 1314 (Rehnquist, J., in chambers) ("[T]he rigidity of [*Miranda*'s] prophylactic rules was a principal weakness in the view of dissenters and critics outside the Court"). But if it is, then the weakness is an inescapable consequence of the *Miranda* Court's decision to supplement the more holistic voluntariness requirement with a one-size-fits-all prophylactic rule.

That is undoubtedly why this Court's *Miranda* cases have never before mentioned "the suspect's age" or any other individualized consideration in applying the custody standard. See *Alvarado*, *supra,* at 666. And unless the

ALITO, J., dissenting

*Miranda* custody rule is now to be radically transformed into one that takes into account the wide range of individual characteristics that are relevant in determining whether a confession is voluntary, the Court must shoulder the burden of explaining why age is different from these other personal characteristics.

Why, for example, is age different from intelligence? Suppose that an officer, upon going to a school to question a student, is told by the principal that the student has an I. Q. of 75 and is in a special-education class. Cf. *In re J. D. B.*, 363 N. C. 664, 666, 686 S. E. 2d 135, 136–137 (2009). Are those facts more or less important than the student's age in determining whether he or she "felt . . . at liberty to terminate the interrogation and leave"? See *Thompson* v. *Keohane*, 516 U. S. 99, 112 (1995). An I. Q. score, like age, is more than just a number. *Ante*, at 8 ("[A]ge is far 'more than a chronological fact'"). And an individual's intelligence can also yield "conclusions" similar to those "we have drawn ourselves" in cases far afield of *Miranda. Ante,* at 12. Compare *ibid.* (relying on *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), and *Roper* v. *Simmons*, 543 U. S. 551 (2005)), with *Smith* v. *Texas*, 543 U. S. 37, 44–45 (2004) *(per curiam).*

How about the suspect's cultural background? Suppose the police learn (or should have learned, see *ante*, at 11) that a suspect they wish to question is a recent immigrant from a country in which dire consequences often befall any person who dares to attempt to cut short any meeting with the police.[9] Is this really less relevant than the fact that a suspect is a month or so away from his 18th birthday?

The defendant's education is another personal charac-

--------

[9] Cf. *United States* v. *Chalan*, 812 F. 2d 1302, 1307 (CA10 1987) (rejecting claim that Native American suspect was "in custody" for *Miranda* purposes because, by custom, obedience to tribal authorities was "expected of all tribal members").

teristic that may generate "conclusions about behavior and perception." *Ante*, at 9 (internal quotation marks omitted). Under today's decision, why should police officers and courts "blind themselves," *ante*, at 1, to the fact that a suspect has "only a fifth-grade education"? See *Clewis*, 386 U. S., at 712 (voluntariness case). Alternatively, what if the police know or should know that the suspect is "a college-educated man with law school training"? See *Crooker* v. *California*, 357 U. S. 433, 440 (1958), overruled by *Miranda, supra,* at 479, and n. 48. How are these individual considerations meaningfully different from age in their "relationship to a reasonable person's understanding of his freedom of action"? *Ante*, at 11. The Court proclaims that "[a] child's age . . . is different," *ante*, at 12, but the basis for this *ipse dixit* is dubious.

I have little doubt that today's decision will soon be cited by defendants—and perhaps by prosecutors as well—for the proposition that all manner of other individual characteristics should be treated like age and taken into account in the *Miranda* custody calculus. Indeed, there are already lower court decisions that take this approach. See *United States* v. *Beraun-Panez*, 812 F. 2d 578, 581, modified 830 F. 2d 127 (CA9 1987) ("reasonable person who was an alien"); *In re Jorge D.*, 202 Ariz. 277, 280, 43 P. 3d 605, 608 (App. 2002) (age, maturity, and experience); *State* v. *Doe,* 130 Idaho 811, 818, 948 P. 2d 166, 173 (1997) (same); *In re Joshua David C.,* 116 Md. App. 580, 594, 698 A. 2d 1155, 1162 (1997) ("education, age, and intelligence").

In time, the Court will have to confront these issues, and it will be faced with a difficult choice. It may choose to distinguish today's decision and adhere to the arbitrary proclamation that "age . . . is different." *Ante*, at 12. Or it may choose to extend today's holding and, in doing so, further undermine the very rationale for the *Miranda* regime.

### B

If the Court chooses the latter course, then a core virtue of *Miranda*—the "ease and clarity of its application"—will be lost. *Moran*, 475 U. S., at 425; see *Fare*, 442 U. S., at 718 (noting that the clarity of *Miranda*'s requirements "has been thought to outweigh the burdens that the decision . . . imposes"). However, even today's more limited departure from *Miranda*'s one-size-fits-all reasonable-person test will produce the very consequences that prompted the *Miranda* Court to abandon exclusive reliance on the voluntariness test in the first place: The Court's test will be hard for the police to follow, and it will be hard for judges to apply. See *Dickerson* v. *United States*, 530 U. S. 428, 444 (2000).

The Court holds that age must be taken into account when it "was known to the officer at the time of the interview," or when it "would have been objectively apparent" to a reasonable officer. *Ante*, at 11. The first half of this test overturns the rule that the "initial determination of custody" does not depend on the "subjective views harbored by . . . interrogating officers." *Stansbury*, 511 U. S., at 323. The second half will generate time-consuming satellite litigation over a reasonable officer's perceptions. When, as here, the interrogation takes place in school, the inquiry may be relatively simple. But not all police questioning of minors takes place in schools. In many cases, courts will presumably have to make findings as to whether a particular suspect had a sufficiently youthful look to alert a reasonable officer to the possibility that the suspect was under 18, or whether a reasonable officer would have recognized that a suspect's I. D. was a fake. The inquiry will be both "time-consuming and disruptive" for the police and the courts. See *Berkemer*, 468 U. S., at 432 (refusing to modify the custody test based on similar considerations). It will also be made all the more complicated by the fact that a suspect's dress and manner will

often be different when the issue is litigated in court than it was at the time of the interrogation.

Even after courts clear this initial hurdle, further problems will likely emerge as judges attempt to put themselves in the shoes of the average 16-year-old, or 15-year-old, or 13-year-old, as the case may be. Consider, for example, a 60-year-old judge attempting to make a custody determination through the eyes of a hypothetical, average 15-year-old. Forty-five years of personal experience and societal change separate this judge from the days when he or she was 15 years old. And this judge may or may not have been an average 15-year-old. The Court's answer to these difficulties is to state that "no imaginative powers, knowledge of developmental psychology, [or] training in cognitive science" will be necessary. *Ante*, at 17. Judges "simply need the common sense," the Court assures, "to know that a 7-year-old is not a 13-year-old and neither is an adult." *Ante,* at 17. It is obvious, however, that application of the Court's new rule demands much more than this.

Take a fairly typical case in which today's holding may make a difference. A 16½-year-old moves to suppress incriminating statements made prior to the administration of *Miranda* warnings. The circumstances are such that, if the defendant were at least 18, the court would not find that he or she was in custody, but the defendant argues that a reasonable 16½-year-old would view the situation differently. The judge will not have the luxury of merely saying: "It is common sense that a 16½-year-old is not an 18-year-old. Motion granted." Rather, the judge will be required to determine whether the differences between a typical 16½-year-old and a typical 18-year-old with respect to susceptibility to the pressures of interrogation are sufficient to change the outcome of the custody determination. Today's opinion contains not a word of actual guidance as to how judges are supposed to go about

making that determination.

## C

Petitioner and the Court attempt to show that this task is not unmanageable by pointing out that age is taken into account in other legal contexts. In particular, the Court relies on the fact that the age of a defendant is a relevant factor under the reasonable-person standard applicable in negligence suits. *Ante*, at 11 (citing Restatement (Third) of Torts §10, Comment *b*, p. 117 (2005)). But negligence is generally a question for the jury, the members of which can draw on their varied experiences with persons of different ages. It also involves a *post hoc* determination, in the reflective atmosphere of a deliberation room, about whether the defendant conformed to a standard of care. The *Miranda* custody determination, by contrast, must be made in the first instance by police officers in the course of an investigation that may require quick decisionmaking. See *Quarles*, 467 U. S., at 658 (noting "the importance" under *Miranda* of providing "a workable rule 'to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront'"); *Alvarado*, 541 U. S., at 668, 669 ("[T]he custody inquiry states an objective rule designed to give clear guidance to the police").

Equally inapposite are the Eighth Amendment cases the Court cites in support of its new rule. *Ante*, at 9, 11, 12 (citing *Eddings,* 455 U. S. 104, *Roper,* 543 U. S. 551, and *Graham* v. *Florida*, 560 U. S. \_\_\_ (2010)). Those decisions involve the "judicial exercise of independent judgment" about the constitutionality of certain punishments. *E.g.*, *id.*, at \_\_\_ (slip op., at 16). Like the negligence standard, they do not require on-the-spot judgments by the police.

Nor do state laws affording extra protection for juveniles during custodial interrogation provide any support for

petitioner's arguments.   See Brief for Petitioner 16–17.
States are free to enact additional restrictions on the
police over and above those demanded by the Constitution
or *Miranda*.   In addition, these state statutes generally
create clear, workable rules to guide police conduct.   See
Brief for Petitioner 16–17 (citing statutes that require or
permit parents to be present during custodial interroga-
tion of a minor, that require minors to be advised of a
statutory right to communicate with a parent or guardian,
and that require parental consent to custodial interroga-
tion).   Today's decision, by contrast, injects a new, compli-
cating factor into what had been a clear, easily applied
prophylactic rule.   See *Alvarado, supra,* at 668–669.[10]

## III

The Court's decision greatly diminishes the clarity and
administrability that have long been recognized as "prin-
cipal advantages" of *Miranda*'s prophylactic requirements.
See, *e.g.*, *Moran,* 475 U. S., at 425.   But what is worse, the
Court takes this step unnecessarily, as there are other,
less disruptive tools available to ensure that minors are
not coerced into confessing.

As an initial matter, the difficulties that the Court's
standard introduces will likely yield little added protection

---

[10] The Court also relies on North Carolina's concession at oral argu-
ment that a court could take into account a suspect's blindness as a
factor relevant to the *Miranda* custody determination.   *Ante*, at 15, and
n. 9.   This is a far-fetched hypothetical, and neither the parties nor
their *amici* cite any case in which such a problem has actually arisen.
Presumably such a case would involve a situation in which a blind
defendant was given "a typed document advising him that he [was] free
to leave."   See Brief for Juvenile Law Center as *Amicus Curiae* 23.   In
such a case, furnishing this advice in a form calculated to be unintelli-
gible to the suspect would be tantamount to failing to provide the
advice at all.   And advice by the police that a suspect is or is not free to
leave at will has always been regarded as a circumstance regarding the
conditions of the interrogation that must be taken into account in
making the *Miranda* custody determination.

for most juvenile defendants. Most juveniles who are subjected to police interrogation are teenagers nearing the age of majority.[11] These defendants' reactions to police pressure are unlikely to be much different from the reaction of a typical 18-year-old in similar circumstances. A one-size-fits-all *Miranda* custody rule thus provides a roughly reasonable fit for these defendants.

In addition, many of the concerns that petitioner raises regarding the application of the *Miranda* custody rule to minors can be accommodated by considering the unique circumstances present when minors are questioned in school. See Brief for Petitioner 10–11 (reciting at length the factors petitioner believes to be relevant to the custody determination here, including the fact that petitioner was removed from class by a police officer, that the interview took place in a school conference room, and that a uniformed officer and a vice principal were present). The *Miranda* custody rule has always taken into account the setting in which questioning occurs, restrictions on a suspect's freedom of movement, and the presence of police officers or other authority figures. See *Alvarado, supra,* at 665; *Maryland* v. *Shatzer*, 559 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 14). It can do so here as well.[12]

Finally, in cases like the one now before us, where the suspect is much younger than the typical juvenile defendant, courts should be instructed to take particular care to

---

[11] See Dept of Justice, Federal Bureau of Investigation, 2008 Crime in the United States (Sept. 2009), online at http://www2.fbi.gov/ ucr/cius2008/data/table_38.html (all Internet materials as visited June 8, 2011, and available in Clerk of Court's case file) (indicating that less than 30% of juvenile arrests in the United States are of suspects who are under 15).

[12] The Court thinks it would be "absur[d]" to consider the school setting without accounting for age, *ante*, at 12, but the real absurdity is for the Court to require police officers to get inside the head of a reasonable minor while making the quick, on-the-spot determinations that *Miranda* demands.

ensure that incriminating statements were not obtained involuntarily. The voluntariness inquiry is flexible and accommodating by nature, see *Schneckloth,* 412 U. S., at 224, and the Court's precedents already make clear that "special care" must be exercised in applying the voluntariness test where the confession of a "mere child" is at issue. *Haley,* 332 U. S., at 599 (plurality opinion). If *Miranda*'s rigid, one-size-fits-all standards fail to account for the unique needs of juveniles, the response should be to rigorously apply the constitutional rule against coercion to ensure that the rights of minors are protected. There is no need to run *Miranda* off the rails.

\*　　\*　　\*

The Court rests its decision to inject personal characteristics into the *Miranda* custody inquiry on the principle that judges applying *Miranda* cannot "blind themselves to . . . commonsense reality." *Ante*, at 1, 8, 10–11, 14. But the Court's shift is fundamentally at odds with the clear prophylactic rules that *Miranda* has long enforced. *Miranda* frequently requires judges to blind themselves to the reality that many un-Mirandized custodial confessions are "by no means involuntary" or coerced. *Dickerson,* 530 U. S., at 444. It also requires police to provide a rote recitation of *Miranda* warnings that many suspects already know and could likely recite from memory.[13] Under today's new, "reality"-based approach to the doctrine, perhaps these and other principles of our *Miranda* jurisprudence will, like the custody standard, now be ripe for

_____

[13] Surveys have shown that "[l]arge majorities" of the public are aware that "individuals arrested for a crime" have a right to "remai[n] silent (81%)," a right to "a lawyer (95%)," and a right to have a lawyer "appointed" if the arrestee "cannot afford one (88%)." See Belden, Russonello & Stewart, Developing a National Message for Indigent Defense: Analysis of National Survey 4 (Oct. 2001), online at http://www.nlada.org/DMS/Documents/1211996548.53/Polling%20results%20report.pdf.

modification. Then, bit by bit, *Miranda* will lose the clarity and ease of application that has long been viewed as one of its chief justifications.

I respectfully dissent.