Filed 5/9/16  In re T.J. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re T.J., a Person Coming Under the Juvenile Court Law. | |
| | D068208 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. J234413) |
| v. | |
| T.J., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Affirmed.

Britton Donaldson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

The juvenile court found true the allegation that then-13-year-old T.J. made a criminal threat (Pen. Code, § 422)[1] by placing a "hit list" in his middle school classmate's backpack. On appeal, T.J. challenges the sufficiency of the evidence supporting the true finding, contending the victim did not suffer "sustained fear" as required by section 422. T.J. further contends the juvenile court erred by admitting statements he made to police because he was subjected to custodial interrogation without first being advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On February 13, 2013, Pershing Middle School student Jacob R. reached into his backpack during math class just after lunch and found a note titled "People I Want to Kill." There were 19 names on the list; Jacob's was first. Jacob was "alarm[ed]" and "scar[ed]" by the note; had "[a] lot of fear"; and "switched to survival mode." He reported the note to the principal. Jacob attended a science fair at school that afternoon. Jacob later testified he was concerned about going to school after he found the note because "this could have taken place the next day. Like this could have been a real event." Jacob testified he did not recall how long he felt this concern.

The same day Jacob found his note, another Pershing Middle School student, Nicole A., found two pieces of paper under her desk during science class. The first page purported to be a journal entry indicating the author, "Chandler," had been bullied and "want[ed] to kill almost everyone in the school." The second page contained a numbered

---

[1] Undesignated statutory references are to the Penal Code.

list of 25 names (including Nicole's nickname); a 26th entry for "anyone else that's left"; and the statement, "My main priority is to kill as many as I can." Nicole was as confused as she was scared when she saw her name on the list because she knew a student named Chandler, but did not know why her name would be on his list—she had "never really talked to him personally." Nicole reported the papers to her teacher.

The school principal immediately notified the San Diego Police Department. Officer Gil Tomeldan responded to the school and met with a vice-principal. Jacob and Nicole had left campus by the time Officer Tomeldan arrived, so he interviewed them later off-campus.

During the course of his investigation, Officer Tomeldan spoke with Sergeant Troy Holliday, who informed Tomeldan of a prior incident at another middle school in which T.J. admitted writing similarly threatening notes. Officer Tomeldan discovered T.J. was now a student at Pershing Middle School and was a classmate of the students whose names were on the hit lists.

Officer Tomeldan questioned T.J. twice during the course of the investigation; he did not advise T.J. of his *Miranda* rights on either occasion. The first interview occurred the day the lists were reported. Officer Tomeldan, Sergeant Holliday, and two other officers went to T.J.'s home unannounced. Sergeant Holliday spoke with T.J.'s father and obtained his consent to speak with T.J. The father invited Tomeldan and Holliday inside,

3

and the three of them sat with T.J. at the kitchen table for 20 to 30 minutes.[2]  The officers

spoke calmly to T.J.; did not touch, restrain, or threaten him; and assured him he was not

under arrest and would not be taken into custody.[3]  T.J. was cooperative and admitted

writing the two lists.  He explained he wrote the lists on behalf of Chandler, who was

being bullied.  T.J. stated he had no bad feelings for his classmates and did not intend to

harm anyone.

At some point during the conversation, T.J. said something that led the officers to

believe he might be a danger to himself or others, so the officers transported him to a local

hospital for a 72-hour mental health evaluation.  T.J. was released the following day.  Officer

Tomeldan and Sergeant Holliday approached T.J.'s father at the hospital about a follow-up

interview with T.J.  The father consented, and the officers interviewed T.J. in the hospital

lobby.  The officers spoke calmly to T.J., did not restrain him, did not intimidate him, and

assured him he was not under arrest.  T.J. confirmed he wrote the two lists, placed one in

Jacob's backpack, and placed the other on the floor beneath Nicole's desk and pointed it out

to her.

The People charged T.J. with two counts of making a criminal threat (one for each

list).  At his adjudication hearing, T.J. moved to exclude the statements he made to police on

the basis they did not first advise him of his *Miranda* rights.  The juvenile court denied the

---

[2]     The record does not make clear where the other two officers were during the
interview.  It is clear, however, that only Officer Tomeldan and Sergeant Holliday
interviewed T.J.

[3]     Although the officers were in uniform, the record does not indicate whether they
were armed.

4

motion, reasoning the father's presence and consent lessened the overbearing nature of police interviewing an unaccompanied child. The prosecutor called Officer Tomeldan, Sergeant Holliday, Jacob, Nicole, and Chandler as witnesses. The defense called a handwriting expert who opined that although there were indications T.J. wrote the two lists, the evidence was inconclusive. The juvenile court found true the count regarding the criminal threat to Jacob, but found the People did not meet their burden with respect to the alleged criminal threat to Nicole. The court declared T.J. a ward of the court (Welf. & Inst. Code, § 602), and placed him on formal probation.

## DISCUSSION

### I. *Substantial Evidence Supports the Juvenile Court's True Finding*

T.J. contends insufficient evidence supports the finding that Jacob was in sustained fear, arguing "there was no evidence in the record of how long this feeling lasted." We disagree.

In reviewing a challenge to the sufficiency of the evidence in a juvenile delinquency case, we apply the same substantial evidence standard of review that we apply in adult criminal proceedings. (See *In re Arcenio V.* (2006) 141 Cal.App.4th 613, 615.) Under this standard, "we examine the entire record in the light most favorable to the prosecution to determine whether it contains reasonable, credible and solid evidence from which the [trier of fact] could find the defendant guilty beyond a reasonable doubt. If the circumstances reasonably justify the verdict, we will not reverse simply because the evidence might reasonably support a contrary finding." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830; see *People v. Johnson* (2015) 60 Cal.4th 966, 988.) " 'The test on

5

appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.] [¶] Before the judgment of the trial court can be set aside for insufficiency of the evidence . . . , it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. . . .' " (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1372; see *People v. Alexander* (2010) 49 Cal.4th 846, 917; *People v. Bradford* (1997) 15 Cal.4th 1229, 1329.) "The testimony of just one witness is enough to sustain a conviction, so long as that testimony is not inherently incredible." (*Daniel G.*, at p. 830; see *People v. Elliott* (2012) 53 Cal.4th 535, 585.) "The trier of fact determines the credibility of witnesses, weighs the evidence, and resolves factual conflicts. We cannot reject the testimony of a witness that the trier of fact chooses to believe unless the testimony is physically impossible or its falsity is apparent without resorting to inferences or deductions." (*Daniel G.*, at p. 830.)

To support a true finding for making a criminal threat, the People must prove the following elements beyond a reasonable doubt: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the

threat,' (4) *that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety*, and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances."  (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228, brackets and ellipses in original, italics added; § 422.)[4] T.J. challenges only the sufficiency of the evidence supporting the fourth element—that Jacob was in "sustained fear for his . . . own safety."  (§ 422, subd. (a).)

"Sustained fear" refers to "a period of time that extends beyond what is momentary, fleeting, or transitory."  (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156; *People v. Wilson* (2015) 234 Cal.App.4th 193, 201 (*Wilson*).)  Several courts have found that "[15] minutes of fear . . . is more than sufficient to constitute "sustained" fear for purposes of . . . section 422.' "  (*Wilson*, at p. 201, ellipses in original, quoting *Allen*, at p. 1156; see *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1348-1349 (*Fierro*).)  For example, the *Allen* court affirmed a finding of sustained fear where the defendant pointed a handgun at the victim in her home, said he was going to kill her and her daughter, then left and was not apprehended by police until 15 minutes later.  (See *Allen*, at pp. 1153, 1156.)  Likewise, the court in *Fierro* affirmed a finding of sustained fear where the

---

4 Section 422, subdivision (a) provides as follows:  "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

defendant threatened to kill the victim during an incident at a gas station, and the victim was still in fear 15 minutes after he had left the station and was driving on the freeway. (See *Fierro*, at pp. 1346, 1348-1349.)  And in *Wilson*, it was undisputed that sustained fear existed where the defendant "acted 'crazy' and unreasonably" in the victim's yard for 15 to 20 minutes and threatened to kill the victim and his family.  (See *Wilson*, at p. 197.)

Substantial evidence supports a reasonable inference that Jacob was in sustained fear.  He testified that when he found the note he was "alarm[ed]," "scar[ed]," had "[a] lot of fear," and "switched to survival mode."  He found the note just after lunch; reported it to the principal; attended a science fair; met with Officer Tomeldan at home later that day; yet was still concerned about going to school because the threat could have been carried out the following day.  Although Jacob testified he did not remember how long he was concerned with going to school after finding the note, it is reasonable to infer from this record that his mental state persisted for more than 15 minutes.

T.J. argues *Allen*, *Wilson*, and *People v. Chandler* (2014) 60 Cal.4th 508 counsel against a finding of sustained fear here because the defendants in those cases made face-to-face threats to the victims at or near their homes, made threatening gestures, and had a history of threatening the victims.  By contrast, T.J. argues, Jacob merely found a note in his backpack that was not specifically addressed to him, Jacob was not at home, and there were no bad feelings between Jacob and T.J.  These distinctions are immaterial here.  In this post-Columbine era, a hit list delivered surreptitiously to a student at school that identifies the recipient as the first target is sufficient to give rise to sustained fear, regardless of how and where the note was discovered, whether it was specifically

8

addressed to the victim, or whether the defendant and the victim had bad feelings toward one another.[5]  Indeed, on this record, these differences *further support* the finding of sustained fear—the fact the note was placed in Jacob's backpack without detection meant his potential killer (1) could be *anyone*, and (2) had gotten close to Jacob without his knowing it.

T.J.'s reliance on *In re Ricky T*. (2001) 87 Cal.App.4th 1132, which reversed a juvenile court's finding of sustained fear, is also unavailing.  There, the appellate court found a lack of substantial evidence where a high school student left class to use the restroom and, upon returning, "found the classroom door locked and pounded on it." (*Id.* at p. 1135.)  When the teacher opened the door, the door struck the student, who became angry, cursed at the teacher, and said, " 'I'm going to get you' " or " 'kick [your] ass.' " (*Id.* at pp. 1135, 1137.)  The teacher "felt threatened" and sent the student to the office, but police were not notified until the next day.  (*Id.* at pp. 1135, 1138.)  The appellate court found there was simply no evidence that the teacher "felt fear beyond the time of the angry utterances" and the student's response was merely "an emotional response to an accident rather than a death threat that induced sustained fear." (*Id*. at pp. 1140-1141.)  Thus, nothing indicated any fear was more than " 'momentary, fleeting, or transitory.' " (*Id*. at p. 1140.)

By contrast, T.J.'s death threat here was deliberate, rather than "an emotional response to an accident" (*In re Ricky T*., *supra*, 87 Cal.App.4th at p. 1141); the threat was

---

5      It is also of no moment that T.J. threatened Jacob away from his home.  (See, e.g., *Fierro, supra*, 180 Cal.App.4th at pp. 1344, 1346-1347 [threat occurred at a gas station].)

reported immediately to police, rather than the following day; Jacob's testimony repeatedly recited the fear the threat induced, whereas the parties in *In re Ricky T.* submitted the matter on two police reports (*id.* at p. 1135); and Jacob was afraid to continue going to school, which suggests his fear was sustained, rather than merely " 'momentary, fleeting, or transitory' " (*id.* at p. 1140).

Substantial evidence supports the juvenile court's finding that Jacob endured sustained fear within the meaning of section 422.

## II.   *No* Miranda *Violation*

T.J. contends the juvenile court erred by admitting the statements he made to police at his home and in the hospital lobby because he was subjected to custodial interrogation without first being advised of his *Miranda* rights.  We disagree.

" 'As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda,* required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." ' "  (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 215.)

"It is clear that advisement of *Miranda* rights is only required when a person is subjected to custodial interrogation."  (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088; *People v. Mickey* (1991) 54 Cal.3d 612, 648 ["Absent 'custodial interrogation,' *Miranda* simply does not come into play."].)  "Custody consists of a formal arrest or a

restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation. [Citation.] All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present." (*People v. Moore* (2011) 51 Cal.4th 386, 395.) A child's age is also relevant to the custody analysis, so long as the questioning officer knew or reasonably should have known the child's age. (See *J.D.B. v. North Carolina* (2011) 564 U.S. 261, 277.) However, "[t]his is not to say that a child's age will be a determinative, or even a significant, factor in every case." (*Ibid.*)

"Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

The totality of circumstances indicate T.J. was not subjected to custodial interrogation. The first interview occurred at the kitchen table in T.J.'s own home, a setting that was informal and familiar to him. The second interview occurred in the

11

hospital lobby—a neutral, public location—*after* the mental health hold had been lifted.[6] On both occasions, the police requested and obtained consent from T.J.'s father before interviewing T.J.

The first interview lasted only 20 to 30 minutes. Two police officers sat at T.J.'s kitchen table with him and his father. The officers spoke calmly to T.J.; did not touch, restrain, or threaten him; and assured him he was not under arrest and would not be taken into custody. Although the record does not indicate the length of the second interview, the officers comported themselves in a manner similar to the first.

Although the police initially focused on T.J. because of his involvement in a similar incident at a different middle school, the record does not suggest the officers' suspicions impacted their treatment of T.J. during either interview. (See *People v. Stansbury* (1995) 9 Cal.4th 824, 830 [police officer's subjective suspicions are "relevant only 'if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave' or if such evidence is 'relevant in testing the credibility of [the officer's] account of what happened during an interrogation . . . .' "]; *People v. Linton* (2013) 56 Cal.4th 1146, 1167 (*Linton*) ["*Miranda* warnings are not required simply because a person has become a suspect in the officer's mind"].) Indeed,

---

6    T.J.'s reliance on *People v. Layton* (1972) 29 Cal.App.3d 349 is thus misplaced, as the defendant there was questioned by police in a hospital emergency room while admitted for a drug overdose. (*Id.* at p. 351.)

Officer Tomeldan testified he had not yet decided whether he would arrest T.J., and he still needed to interview Chandler.

Finally, the juvenile court expressly considered T.J.'s age in its custody analysis, concluding the father's presence and consent at both interviews lessened the overbearing nature of police interviewing an unaccompanied child. This conclusion is sound. On appeal, T.J. asserts for the first time that his father's presence was coercive because the father is abusive. This assertion is unsupported by the record. To the contrary, Officer Tomeldan testified that he observed T.J. and his father interact, and there was nothing "about that interaction that seemed intimidating or that [stuck] out in [Tomeldan's] mind as something that might have an effect on [T.J.]"

The circumstances of both interviews are similar to those of *Linton, supra*, 56 Cal.4th 1146, in which the California Supreme Court found no *Miranda* violation. In *Linton*, a plainclothes detective initially spoke with the defendant about the murder of a 12-year-old neighbor. (*Id.* at pp. 1155, 1165-1166.) The detective returned to the defendant's home with a deputy district attorney after subsequently acquiring information that suggested the defendant had misrepresented his prior interactions with the victim. (*Id.* at pp. 1165-1166.) The investigators asked the defendant to speak with them, making clear that he was not required to do so and was not under arrest. (*Id.* at p. 1165.) The defendant agreed to talk, invited them into his home, and led them to his bedroom, where the three men sat on chairs. (*Ibid.*) The investigators either were not armed, or if they were, they did not display their weapons. (*Id.* at p. 1167.) The defendant was not handcuffed or restrained, and the detective reiterated that the defendant was not under

13

arrest and was not required to speak with them. (*Id.* at p. 1165.) The investigators' questioning did "not appear to have been aggressive or particularly confrontational." (*Id.* at p. 1167.) The interview lasted approximately 30 minutes. (*Id.* at p. 1166.) On these facts, the Supreme Court concluded that "[a] reasonable person in defendant's situation would have understood he was free to stop the interview and ask [the investigators] to leave at any time. Defendant was not in custody." (*Ibid.*)

Similarly, here, the police obtained consent to interview T.J.; told him he was not under arrest; interviewed him in a familiar or neutral location with his father present; sat while interviewing T.J. in his kitchen; did not restrain T.J.; spoke calmly and nonthreateningly; and questioned T.J. for no more than 30 minutes. Based on the totality of these circumstances, a reasonable person of T.J.'s age and in his position would have believed he was free to leave or terminate the interview if he so desired. Accordingly, the juvenile court did not err in admitting T.J.'s statements to police.

DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

15