Filed 3/30/23

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Tehama)

----

| | |
|---|---|
| In re S.S., a Person Coming Under the Juvenile Court Law. | C097055 |
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>S.S.,<br><br>　　　　Defendant and Appellant. | (Super. Ct. No. 22JU-000046) |

APPEAL from a judgment of the Superior Court of Tehama County, Matthew C. McGlynn, Judge. Reversed and remanded for further proceedings.

Law Office of Theresa Stevenson, Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kenneth N. Sokoler and Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

Minor S.S. (minor) appeals from an order transferring him from the juvenile court to a court of criminal jurisdiction, pursuant to former Welfare and Institutions Code section 707.[1] (Stats. 2018, ch. 1012, § 1, amended by Stats. 2022, ch. 330, § 1.) Minor contends: (1) the juvenile court's findings were not supported by substantial evidence and (2) subsequent legislation applies retroactively and requires reversal because the juvenile court did not comply with new requirements for transfer hearings. The People concede the second argument. We agree with the parties that the new law applies retroactively and conclude we must reverse the transfer order and remand for an amenability hearing in compliance with the new law. We, therefore, need not address minor's first contention.

BACKGROUND

A. *Petition and Transfer Motion*

The Tehama County District Attorney's Office filed a petition alleging that minor, age 17 at the time, committed murder (Pen. Code, § 187) and attempted murder (Pen. Code, §§ 21a, 187) using a deadly or dangerous weapon (Pen. Code, § 12022, subd. (b)(1)), bringing minor within the jurisdiction of the juvenile court (§§ 602, 650). The petitioner then filed a motion to transfer minor from the juvenile court to a court of criminal jurisdiction, pursuant to former section 707. The petitioner later amended the petition to allege minor also committed two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and two counts of exhibiting a deadly weapon (Pen. Code, § 417, subd. (a)(1)), and to allege minor inflicted great bodily injury upon the murder and attempted murder victims (Pen. Code, § 12022.7, subd. (a)).

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

B.    *Witness Reports of the Incident*

In preparation for the hearing on the transfer motion, the probation officer filed a report on minor's behavioral patterns and social history. The report also summarized reports from the Tehama County Sheriff's Office regarding the incident that led to the filing of the petition. Officers arrived at a house hosting a party and found two people had been stabbed. Minor had attended the party with three friends. Minor drank alcohol and was visibly drunk at the party, and he still smelled of alcohol when officers confronted him at his house later that night. One of minor's friends reported that a group of boys was harassing a group of girls at the party, so he and minor spoke with the boys to get them to stop. Other witnesses reported minor and his friend threatened to stab, shoot, or kill people. One witness reported a large fight involving minor. Several witnesses reported minor's friend holding minor back from several physical confrontations, which minor's friend confirmed.

Though the details varied, many witnesses reported that, either during the large disturbance or in two separate incidents, minor stabbed two people. One victim, E.B., reported minor began accosting his friend, and when E.B. stepped in between, minor stabbed him twice in the back. The other victim, E.V., died of a single stab wound to the abdomen. A witness reported minor had swung the knife at him but missed and hit E.V. instead. That witness also reported minor had then stabbed E.V. a second time, which was not consistent with the hospital's treatment notes or other witness reports. When police officers found minor at his home later that night, he had blood on his sweatshirt, he refused to come out to speak with them for approximately 30 minutes, and he changed his clothes before coming out.

The probation officer also interviewed minor. Minor stated he had been drinking all day, the day of the party. He then drank beer at the party, was "pretty drunk," and only remembered "bits and pieces" of the night. Minor did not remember any physical altercation at the party. Rather, he remembered five people waiting for him when he got

3

home; they started a fight with minor and his friend because they were mad that one member of the group's sister was with minor. Minor believed he had not stabbed anyone that night.

C.    *Psychological Evaluation*

The probation office also filed an evaluation of minor by a court appointed clinical psychologist, Dr. J. Reid McKellar. (§ 707, subd. (a)(2)). Dr. McKellar reported that, earlier in his childhood, minor was physically abused by his stepfather and witnessed extensive domestic violence against his mother. Based on interviews with minor and his mother, consultation with the probation officer, and various documentary sources, Dr. McKellar diagnosed minor with generalized anxiety disorder, trauma and stressor related disorder, alcohol use disorder, and cannabis use disorder. Due to these disorders and underdeveloped coping skills, minor "may be prone to externalizing his fears and sense of alienation in an impulsive manner" and is "likely prone to impulsive and destructive behaviors, particularly when under the influence of a substance or alcohol." Minor's "capacity to make sound decisions is further undermined by unresolved trauma concerns, which are most evident in [minor]'s symptoms of anxiety and sleep disturbance." Dr. McKellar explained that minor would benefit from: (1) moral recognition training or empathy training; (2) trauma-focused cognitive behavioral therapy, including cognitive techniques to help reduce symptoms of anxiety and depression; (3) 12-step facilitative drug abuse therapy; (4) assertiveness training; and (5) vocational assessment and coaching.

The probation report noted minor had been referred to Tehama County Child Protective Services six times for general neglect and physical abuse. The report also detailed minor's prior angry, insulting, and disobedient behavior in school and minor's history of substance abuse, starting at age 13.

D.      *Transfer Hearing and Ruling*

At the hearing on the petitioner's motion to transfer minor to a court of criminal jurisdiction, the only evidence introduced in addition to the probation report and the psychological evaluation was an autopsy report introduced by the petitioner.  The parties addressed the five criteria that section 707, subdivision (a)(3) requires the juvenile court to consider.  After taking a recess to review the documents in light of the parties' arguments, the juvenile court first noted the petitioner had the burden of proving by a preponderance of the evidence that the case should be transferred.  (See Cal. Rules of Court, rule 5.770(a).)[2]  The juvenile court then analyzed the evidence with respect to each of the five criteria.  We detail the juvenile court's analysis in our discussion below.

After analyzing each of the five criteria, the juvenile court concluded minor was "not fit to be treated within the jurisdiction of the juvenile court" and ordered minor transferred to a court of criminal jurisdiction.  Minor timely appealed from the transfer order.

DISCUSSION

A.      *Amendments to Section 707*

At the time of minor's transfer hearing, the governing law and the corresponding Rule of Court required the petitioner to establish by a preponderance of the evidence that "the minor should be transferred to a court of criminal jurisdiction."  (Former § 707, subd. (a)(3), as amended by Stats. 2018, ch. 1012, § 1; rule 5.770(a).)[3]  Effective January 1, 2023, the Legislature amended section 707, adding the following language: "In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to

---

**2**      Undesignated rule references are to the California Rules of Court.

**3**      As of the filing of this opinion, the Judicial Council has not revised rule 5.770(a) to conform to the amended section 707.

5

rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3), as amended by Stats. 2022, ch. 330, § 1, (Assembly Bill No. 2361).) This changed the finding a juvenile court must make before ordering a transfer in two ways: (1) raising the standard of proof and (2) requiring a new specific finding regarding amenability to rehabilitation.

To determine the scope and effect of these changes, we examine the text "to determine the Legislature's intent so as to effectuate the law's purpose." (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) "We consider the ordinary meaning of the relevant terms, related provisions, terms used in other parts of the statute, and the structure of the statutory scheme." (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 227.) "[T]he Legislature 'is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted.' " (*People v. Frahs* (2020) 9 Cal.5th 618, 634.) And, "when the Legislature amends a statute, we presume it was fully aware of the prior judicial construction." (*White v. Ultramar* (1999) 21 Cal.4th 563, 572.)

1.      *Legal Background*

In its analysis of these amendments, the Legislature explained that the changes were intended to address recent developments in law and new scientific research regarding juveniles:

"Over the last several years, there have been a series of U.S. Supreme Court cases involving juvenile defendants that have recognized the inherent difference between juveniles and adults for purposes of sentencing, relying in part on research on brain and adolescent development. (*See Roper v. Simmons* (2005) 543 U.S. 551 [125 S.Ct. 1138, 161 L.Ed. 2d]; *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011, 176 L.Ed. 825]; *J.D.B. v. North Carolina* (2011) 564 U.S. 261 [131 S. Ct. 2394, 180 L.Ed. 310 ]; *Miller v. Alabama* (2012) 567 U.S. 460 [132 S.Ct. 2455, 183 L.Ed. 2d 407].) The Court summarized those differences in *Miller*:

6

" 'Roper and Graham establish that children are constitutionally different from adults for purposes of sentencing.  Because juveniles have diminished culpability and greater prospects for reform, we explained, 'they are less deserving of the most severe punishments.' Graham, 560 U.S., at [p.] 68, 130 S.Ct. 2011, 176 L.Ed. 2d 825.  Those cases relied on three significant gaps between juveniles and adults.  First, children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking.  Roper, 543 U.S., at [p.] 569, 125 S.Ct. 1183, 161 L.Ed. 2d 1.  Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings.  Ibid.  And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'  (567 U.S. 460, 570 [125 S.Ct. 1183, 161 L. Ed. 2d 1].)'

"This body of case law and the research relied upon in these cases prompted the passage of several juvenile justice reform measures in the state in the past decade.  In addition, the voters passed Proposition 57 in 2016, which among other things, eliminated the ability of a prosecutor to file charges against a juvenile offender directly in criminal court.  (See, *Voter Information Guide for 2016* <https://vig.cdn.sos.ca.gov/2016/general/en/pdf/complete-vig.pdf>.)"  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2361 (2021-2022 Reg. Sess.) Aug. 3, 2022, pp. 4-5; accord Assem. Com. on Public Safety, Analysis of Assem. Bill No. 2361 (2021-2022 Reg. Sess.) as amended Mar. 31, 2022, pp. 4-5.)

Continuing this trend, the bill's author explained that the amendments to section 707 " 'will reduce arbitrary determinations surrounding the transfer of juveniles to adult court by establishing that the court's decision to transfer a juvenile must be based on sufficient evidence.  Rehabilitation is the way forward, and that includes giving juveniles

7

who have made a mistake the opportunity to create a new future as they prepare to reenter our society as adults.' " (Assem. Off. of Chief Clerk, 3d reading analysis of Assem. Bill No. 2361 (2021-2022 Reg. Sess.) as amended Mar. 31, 2022, p. 1.)

2.     *Clear and Convincing Evidence*

Assembly Bill No. 2361's purpose was in part achieved by raising the standard of proof to "clear and convincing evidence." (§ 707, subd. (a)(3).) "The standard of proof known as clear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998; see also Evid. Code, § 115.) " 'Clear and convincing' evidence requires a finding of high probability." (*In re Angelia P.* (1981) 28 Cal.3d 908, 919, superseded by statute on another issue as stated in *In re Cody W.* (1994) 31 Cal.App.4th 221, 229-230; accord Judicial Council of California Civil Jury Instructions (2023) CACI No. 201.) Courts have also described the standard "as requiring that the evidence be ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " (*In re Angelia P.,* at p. 919.)

3.     *Amenability to Rehabilitation*

Assembly Bill No. 2361 also requires juvenile courts to find "the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).) This language resembles earlier versions of section 707, which, from the enactment of the Juvenile Court Law in 1961 until the approval of Proposition 57, the Public Safety and Rehabilitation Act of 2016, required juvenile courts to analyze whether minors are "amenable to the care, treatment, and training program available through the facilities of the juvenile court." (Compare Stats. 1961, ch. 1616, § 2, p. 3485 and Stats. 2015, ch. 234, § 2 with Ballot Pamp., Gen. Elec. (Nov. 8, 2016) text of Prop. 57, p. 142.)

Given the Legislature's refocusing on minors' amenability to rehabilitation, expert testimony will likely be necessary for a complete analysis. Our Supreme Court has

8

offered substantial guidance for this analysis that applies to the new language as well as the old: "Though the standards for determining a minor's fitness for treatment as a juvenile lack explicit definition [citations], it is clear from the statute that the court must go beyond the circumstances surrounding the offense itself and the minor's possible denial of involvement in such offense. . . . [¶]. . . Since the dispositive question is the minor's amenability to treatment through the facilities available to the juvenile court, testimony of experts that the minor can be treated by those facilities is entitled to great weight in the court's ultimate determination. Moreover, if the court otherwise decided that the [juvenile court] program was best suited to the needs of the minor, it could hold him unfit if those experts testified that rehabilitation might require treatment beyond the date of his mandatory discharge." (*Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709, 714-715.)

The renewed focus on rehabilitation also means courts must take care not to place too much weight on the probation officer's "report on the behavioral patterns and social history of the minor." (§ 707, subd. (a)(1).) Even after the approval of Proposition 57, when juvenile courts only considered "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction," (§ 707, former subd. (a)(2)(B)(i)), as one of five criteria for determining whether to transfer a minor to criminal court, courts cautioned against accepting probation officer's conclusions regarding minors' prospects for rehabilitation. For example, in *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, the appellate court held the juvenile court's finding that minor was unsuitable for treatment as a juvenile because he only had three years left before he aged out of the juvenile court's jurisdiction was not supported by substantial evidence because the finding was based solely on the probation officer's unsupported conclusion:

"Here, the prosecution did not present any expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate J.N. before termination of the juvenile court's jurisdiction. There was no

9

evidence that demonstrated existing programs were unlikely to result in J.N.'s rehabilitation, why they were unlikely to work in this case, or that they would take more than three years to accomplish the task of rehabilitating J.N.

"Even if we were to accept the probation officer's conclusion in the suitability report as an expert opinion, and we do not, the conclusion under this factor was not supported by the evidence. 'If we could accept plaintiff's expert witnesses' testimony *at face value*, this testimony would itself support the trial court's findings. However, we may not do so. " 'The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion; . . . it does not lie in his mere expression of conclusion.' " [Citation.] "Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value. [Citations.] In those circumstances the expert's opinion cannot rise to the dignity of substantial evidence. [Citation.] When a trial court has accepted an expert's ultimate conclusion without critical consideration of his reasoning, and it appears the conclusion was based upon improper or unwarranted matters, then the judgment must be reversed for lack of substantial evidence." [Citation.] "If [the expert's] opinion is not based upon facts otherwise proved, or assumes facts contrary to the only proof, it cannot rise to the dignity of substantial evidence." [Citations.]'

"The probation officer's opinion in his report was not substantial evidence because the *opinion* lacked support by substantial evidence. [Citation.] There was no evidence as to the efforts necessary to rehabilitate J.N. and no evidence as to why available programs were unlikely to result in rehabilitation in the time allotted. This lack of evidence rendered any opinion based on the report without evidentiary value. Therefore, the prosecution failed to establish by a preponderance of evidence J.N. was unsuitable for

10

treatment in the juvenile court. The court's finding J.N. was unsuitable was not supported by substantial evidence and was, therefore, an abuse of discretion." (*J.N. v. Superior Court, supra*, 23 Cal.App.5th at p. 722.)

Taken together, the changes to section 707 refocus juvenile courts on minors' amenability to rehabilitation. Under prior versions of the statute, courts determined whether minors were "fit and proper subject[s] to be dealt with under the juvenile court law" and considered "rehabilitation" and "amenability to care, treatment, and training" as part of the analysis. (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 548-549; see also § 707, former subd. (a)(1), as amended by Stats. 2007, ch. 137, § 1.) After Proposition 57 removed the language regarding both fitness and amenability, some courts that had referred to section 707 hearings as "fitness hearings" began referring to "transfer hearings." (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 306, fn. 4; see also Ballot Pamp., Gen. Elec. (Nov. 8, 2016) text of Prop. 57, pp. 142-145.) Now that section 707 makes "amenab[ility] to rehabilitation" the ultimate determination, juvenile courts would be better served referring to "amenability hearings." The analysis of the five criteria set forth in the statute should be focused through the lens of amenability to rehabilitation.

B.      *Retroactivity*

As an initial matter, we agree with the parties that the amended version of section 707 applies retroactively to this case. As the parties note, the recent amendments have similar ameliorative effects to amendments made to section 707 by Proposition 57, which prohibited prosecutors from charging juveniles with crimes directly in a court of criminal jurisdiction and gave the prosecution the burden of proof at transfer hearings. (§ 707, former subd. (a)(1), as amended by Prop. 57 (Nov. 9, 2016) § 4.2; Evid. Code, § 500; see *People v. Superior Court (Lara), supra*, 4 Cal.5th at p. 303.) Our Supreme Court held those amendments applied retroactively because they effectively reduced the possible punishment for juveniles: "[t]he possibility of being treated as a juvenile in juvenile

11

court — where rehabilitation is the goal — rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment." (*Lara*, at p. 303; see *In re Estrada* (1965) 63 Cal.2d 740; *People v. Francis* (1969) 71 Cal.2d 66.) The latest amendments likewise make it more difficult to transfer juveniles from juvenile court, which similarly reduces the possible punishment for juveniles. Accordingly, we conclude the current version of section 707 applies retroactively to minor's case, which is not yet final. (See *People v. McKenzie* (2020) 9 Cal.5th 40, 45 [presumption of retroactivity " ' "applies to any such proceeding which, at the time of the supervening legislation, has not yet reached final disposition in the highest court authorized to review it" ' "].)

C.     *Analysis*

We also agree with the parties that, applying the amendments to section 707 retroactively, the juvenile court erred in ordering minor's transfer. The juvenile court expressly applied the former preponderance of the evidence standard and directed its analysis to whether minor was "fit for juvenile court," not whether minor is "amenable to rehabilitation while under the jurisdiction of the juvenile court." Though it applied the law in effect at the time, the juvenile court violated the retroactively-applied current version of section 707.

Given these errors, we must determine whether a "miscarriage of justice" has resulted. (Cal. Const., art. VI, § 13.) Because the juvenile court erred in applying state law, we will find a miscarriage of justice occurred only if " 'after an examination of the entire cause, including the evidence,' [we are] of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Gonzalez* (2018) 5 Cal.5th 186, 195-196.)

The parties, by urging remand for a new transfer hearing, implicitly agree a more favorable result for minor is reasonably probable. Taking into account the heightened

12

standard of proof and viewing the juvenile court's analysis of the five section 707 criteria through the lens of amenability to rehabilitation, we conclude it is reasonably probable the juvenile court would not order minor's transfer under the current version of section 707.

      1.      *Degree of Criminal Sophistication*

For the "degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)), the juvenile court found minor had no intellectual or other impairment that limited his ability to know the difference between right and wrong. The court found minor had not acted impetuously, contrary to the psychological report's conclusion that minor would act impulsively and violently when feeling anxious or frustrated, especially when under the influence of alcohol. The court disregarded testimony minor had confronted a group of boys who had been harassing a group of girls, and found that minor had not been provoked and was not under any peer pressure. The court also found minor's childhood trauma would not contribute to the crimes he committed, contrary to the psychological report's conclusion that minor's capacity to make sound decisions was undermined by unresolved trauma from the physical abuse he suffered and witnessed as a child. The court concluded that, because minor had a knife, threatened to kill with that knife, and, in fact, killed with that knife, his degree of criminal sophistication was so significant that he was not "a fit and proper subject to benefit with the — to remain within the jurisdiction of the juvenile court."

The juvenile court's analysis does little to explain the "criminal sophistication" of drunkenly fighting at a party with a knife, which suggests the higher standard of proof may change the juvenile court's analysis. (See *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 193 ["the mere fact that a minor is of normal intelligence. . . [or minor's] knowledge that his actions were wrong and his ability 'to appreciate risks and consequences of criminal behavior' [citation] . . . do not in and of themselves demonstrate criminal sophistication"].) More importantly, this analysis is not directed to

13

the ultimate question of whether minor is amenable to rehabilitation. Rather, the court rejected the only pieces of evidence relevant to minor's amenability to rehabilitation, the psychologist's uncontested conclusions that minor's mental health diagnoses likely led minor to act impulsively and violently, rather than in a sophisticated manner, and that minor's conditions were treatable. Giving this evidence the greater weight accorded in the new statute suggests a reasonable probability the juvenile court would not order minor's transfer.[4]

2.    *Rehabilitation Prior to Expiration of Juvenile Court Jurisdiction*

Next, considering "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)), the juvenile court found that in the four and a half months since the incident, minor had turned 18 years of age and had shown no remorse for his actions, which meant there was not enough time for the juvenile court to rehabilitate him. The court did not address how long the juvenile court could maintain jurisdiction over minor or discuss the psychological report's findings that minor would benefit from a number of common counseling and treatment programs. The court also found minor denied being involved in any altercations the night of the party, contrary to minor's statement to the probation officer that he had been attacked by a group of boys from the party at his house that night. The court also faulted minor for refusing to accept responsibility despite his bloodstained clothes, for his affect in the interview with the probation officer, and for failing to engage in offered treatment at juvenile hall. Accordingly, the court found this criterion also indicated minor was not "fit for the juvenile court."

---

**4**    Our analysis of the evidence now in the record does not limit what the parties may offer into evidence on remand. (§ 707, subd. (a)(3) [petitioner and minor may submit any relevant evidence].)

14

Given the amended statute's greater emphasis on rehabilitation, the juvenile court and the prosecution placed undue weight on the fact that minor had just turned 18 years of age. The juvenile court could retain jurisdiction over minor until at least age 25, given the severity of the charges against him. (§§ 607, subd. (c), 707, subd. (b)(1); Pen. Code, § 190; see also § 1800; *O.G. v. Superior Court* (2021) 11 Cal.5th 82, 93 [§ 1800, subd. (a) "permits the prosecutor to petition for an extension of juvenile court jurisdiction, even past the age of 25, if discharging a juvenile offender 'would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality that causes the person to have serious difficulty controlling his or her dangerous behavior' "].)

In addition, proper analysis of this criterion generally requires "expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate [the minor] before termination of the juvenile court's jurisdiction." (*J.N. v. Superior Court*, *supra*, 23 Cal.App.5th at p. 722.) The prosecution here presented no evidence to demonstrate what minor's rehabilitative needs were, much less why they could not be met within the juvenile court's jurisdiction. The juvenile court nevertheless finding it lacked sufficient time to rehabilitate minor was an abuse of discretion even prior to the recent amendments. (*Kevin P. v. Superior Court, supra*, 57 Cal.App.5th at p. 200; accord *J.N.,* at pp. 721-722.) Accordingly, we conclude the analysis of this criterion also suggests a reasonable probability the juvenile court would not order minor's transfer under the new version of section 707.

3. *Previous History in the Juvenile Justice System*

Considering "minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)), the juvenile court noted minor's only other involvement with the juvenile court: less than two weeks prior to the incident at the party, minor had been arrested for brandishing a firearm during an altercation at a party. The Butte County District Attorney's Office had declined to file a petition in that matter and the juvenile court had placed minor on

15

informal probation. The court added that minor had yelled something indicating a gang affiliation but did not explain how this connected to minor's previous history, given the only evidence of this was from a witness to the current offenses, not the prior offense. The court found the prior incident also was not caused by childhood trauma, again contradicting the psychological report. Rather, the court found the prior incident demonstrated minor wanted to be a "criminal" and a "thug" and "he continued that conduct on the night of the party, resulting in the victimization of several individuals and the death of a child." The court concluded this criterion was "significant," implying it supported minor's transfer.

In similar cases, courts analyzing this factor have found that more significant prior contacts with the juvenile justice system than minors weighed against transfer to a court of criminal jurisdiction. In *C.S. v. Superior Court*, the petition alleged the minor had committed " 'the unprovoked murder of an unarmed innocent child.' " (*C.S. v. Superior Court*, (2018) 29 Cal.App.5th 1009, 1033.) But the minor " 'had very few offenses in comparison with other youth of his age in similar circumstances,' " so the court upheld the juvenile court's finding that this criterion weighed against transfer to criminal court. (*Id.* at p. 1032.) In *J.N. v. Superior Court*, the petition likewise alleged murder, and the court upheld the juvenile court's finding that the minor's two prior petitions alleging fighting in public and truancy weighed against transfer to criminal court. (*J.N. v. Superior Court, supra*, 23 Cal.App.5th at pp. 711-712, 719-720.)

While the affirmance of these court's findings does not necessarily mean the juvenile court abused its discretion in this case, it does indicate that this is a close issue. Section 707's new focus on amenability to rehabilitation shifts the court's inquiry to whether minor's one prior incident makes him not amenable to rehabilitation. Given this shift in focus, we conclude this criterion also suggests a reasonable probability the juvenile court would not order minor's transfer.

16

4. *Previous Rehabilitation Attempts*

The juvenile court then considered the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor." (§ 707, subd. (a)(3)(D)(i).) The court gave little weight to this criterion because minor had been "on informal probation for less than two weeks, which is not sufficient treatment to indicate that he was successful or not." Nevertheless, the court disagreed with the probation report's assessment that minor would be "fit to be treated within the juvenile court" because minor's subsequent violent conduct after being on informal probation indicated "failure of any type of treatment he received." The court did not indicate whether minor received any treatment while on informal probation.

The parties did not introduce evidence of any attempts to rehabilitate minor during the less than two-week period between his first interaction with a juvenile court and the offense at issue. The juvenile court did not give this criterion great weight, but, in the absence of any evidence that previous rehabilitation attempts make minor not amenable to rehabilitation, there is a reasonable probability the juvenile court would find this criterion supports treating minor as a juvenile under the current statute.

5. *Circumstances and Gravity of Alleged Offense*

Lastly, the juvenile court addressed "the gravity of the offense." (§ 707, subd. (a)(3)(E)(i).) The court found minor "was the sole perpetrator," threatened several victims, stabbed several victims, and killed one victim. The court explained: "there is no greater harm than murder, and that's exacerbated by the fact that [minor] murdered a 14-year-old child who was not engaged in doing anything other than trying to save another victim." The court also indicated it believed minor had been seeking out an original victim, though the probation report indicates minor was looking for one of the friends he attended the party and returned home with.

Though the gravity of the alleged offense is necessarily undisputed, the juvenile court also relied on its own unique interpretation of facts contrary to the probation report

17

in analyzing this criterion. Under the heightened standard of proof, the probation report's conflicting interpretation of minor's attempts to locate a specific individual at the party may change the juvenile court's analysis to some extent. We conclude the juvenile court's analysis of this criterion does not affect the probability the court would change its decision to transfer minor under the current version of section 707.

      6.    *Conclusion*

Because the amendments to section 707 significantly change how the juvenile court must analyze the evidence to determine whether to transfer minor to a court of criminal jurisdiction, we conclude there is a reasonable probability the court would not have transferred minor had it applied the current law. Accordingly, we will reverse the juvenile court's transfer order and remand for further proceedings consistent with current law.

The amended version of section 707 requires the juvenile court to consider each of the five statutory criteria and how those criteria affect minor's amenability to rehabilitation while under the jurisdiction of the juvenile court. (§ 707, subd. (a)(3).) This is not a simple task for the court or for the parties, who must introduce evidence relevant to this complicated determination, likely including expert testimony. This difficulty reflects the Legislature's caution: "The transfer of a juvenile to adult court is an extremely serious decision with a lifetime of consequences, and one which should not be taken lightly." (Assem. Off. of Chief Clerk, 3d reading analysis of Assem. Bill No. 2361 (2021-2022 Reg. Sess.) as amended Mar. 31, 2022, p. 1.) After the amenability hearing, the juvenile court must "recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding." (§ 707, subd. (a)(3).) This means the court should "explicitly 'articulate its evaluative process' by detailing 'how it weighed the evidence' and by 'identify[ing] the specific facts which persuaded the court' to reach its decision" whether to transfer minor to a court of criminal jurisdiction. (*C.S. v. Superior Court, supra*, 29 Cal.App.5th at pp. 1034-1035.) The

18

court's explanation, like its analysis, should focus on minor's amenability to rehabilitation.

DISPOSITION

The juvenile court's order transferring minor to a court of criminal jurisdiction is reversed, and the matter is remanded to the trial court to conduct an amenability hearing pursuant to current law and for further proceedings as may be just under the circumstances.

_____\s\_____,
McADAM, J.*

We concur:

\_\_\_\_\_\s\_____,
DUARTE, Acting P. J.

\_\_\_\_\_\s\_____,
BOULWARE EURIE, J.

---

\* Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.