**[Cite as *In re D.T.*, 2023-Ohio-4832.]**

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | | |

IN RE: D.T.

C.A. No.     22CA011880

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.     20JD59036

DECISION AND JOURNAL ENTRY

Dated: December 29, 2023

CARR, Presiding Judge.

{¶1}    Appellant, D.T., appeals the judgment of the Lorain County Court of Common Pleas, Juvenile Division. This Court reverses.

I.

{¶2}    In February 2020, a complaint was filed alleging that D.T. was a delinquent child by having committed gross sexual imposition, a felony of the third degree if committed by an adult. The alleged offense occurred in November 2019 and involved his younger sister.

{¶3}    In August 2020, following a competency evaluation, the trial court found D.T. was not competent to stand trial but was restorable to competency. Competency attainment services were then ordered. In January 2021, the trial court found D.T. had been restored to competency.

{¶4}    In May 2021, a motion to suppress was filed asserting that D.T.'s statements made to police during a December 2019 interview should be suppressed because the statements were not

voluntary and because there was not compliance with the tenets of *Miranda v. Arizona*, 384 U.S. 436 (1966). The State opposed the motion.

{¶5} The matter was heard before a magistrate, who issued a decision denying D.T.'s motion to suppress. Therein, the magistrate concluded that D.T. was not in custody, and, even if he was, he was read the *Miranda* warnings and waived his rights. In addition, the magistrate determined that D.T.'s statements were voluntary. The trial court entered judgment accordingly the same day.

{¶6} D.T. filed objections to the decision. The trial court heard arguments on the objections and ultimately overruled D.T.'s objections.

{¶7} D.T. entered a plea of no contest and was adjudicated delinquent. Following a dispositional hearing, the trial court entered judgment.

{¶8} D.T. filed a motion for a delayed appeal, which this Court ultimately granted. D.T. has raised two assignments of error for our review, which will be addressed out of sequence to facilitate our review.

II.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED IN FAILING TO SUPPRESS D.T.'S STATEMENTS TO THE POLICE BECAUSE THEY WERE OBTAINED WITHOUT A VALID *MIRANDA* WAIVER IN VIOLATION OF THE PRIVILEGE AGAINST COMPELLED SELF-INCRIMINATION GUARANTEED BY THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.

{¶9} D.T. argues in his second assignment of error that the trial court erred in denying his motion to suppress because D.T. was subjected to custodial interrogation and did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.

{¶10} Generally, "the decision to adopt, reject, or modify a magistrate's decision lies within the discretion of the trial court and should not be reversed on appeal absent an abuse of discretion. However, [i]n so doing, we consider the trial court's action with reference to the nature of the underlying matter." (Internal quotations and citations omitted.) *In re S.S.*, 9th Dist. Wayne No. 21AP0022, 2023-Ohio-245, ¶ 8.

{¶11} A motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Thus, a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶12} "The Fifth Amendment to the United States Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.' The Fifth Amendment applies to the states through the Fourteenth Amendment." (Internal citations and quotations omitted.) *State v. Rafferty*, 9th Dist. Summit No. 26724, 2015-Ohio-1629, ¶ 31. "Juveniles are entitled both to protection against compulsory self-incrimination under the Fifth Amendment and to *Miranda* warnings where applicable." (Internal citations and quotations omitted.) *Id.*

{¶13} "Under *Miranda*, the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (Internal

citations and quotations omitted.) *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 113.

"*Miranda* warnings are required 'only when a suspect is subjected to both custody and interrogation.'" *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, ¶ 56, quoting *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, ¶ 119.

> In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave. Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective test to resolve the ultimate inquiry of whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

(Internal citations and quotations omitted.) *In re A.A.*, 9th Dist. Lorain No. 08CA009512, 2009-Ohio-4094, ¶ 7.

{¶14} The United States Supreme Court has held that "a child's age properly informs the *Miranda* custody analysis." *J.D.B. v. North Carolina*, 564 U.S. 261, 265 (2011). In so doing, the Court noted that, "[i]t is beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave." *Id.* at 264-265. Thus, "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test." *Id.* at 277.

{¶15} If a suspect is subject to custodial interrogation, "[p]rior to questioning, the police must warn the suspect that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (Internal quotations omitted.) *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, ¶ 22, quoting *Miranda*, 384 U.S. at 444. "If custodial interrogation continues in the absence of an attorney after a police officer advises a suspect of his rights, the government bears 'a heavy burden'

to demonstrate by a preponderance of the evidence that the suspect 'knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel' before speaking to the police." *Barker* at ¶ 23, quoting *Miranda* at 475. "A court may not presume a valid waiver either from the suspect's silence after warnings are given or from the fact that the suspect eventually confessed. Rather, the record must show that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver. If the state does not satisfy its burden, no evidence obtained as a result of interrogation can be used." (Internal quotations and citations omitted.) *Barker* at ¶ 23.

> To determine whether a suspect knowingly, intelligently, and voluntarily waived his *Miranda* rights, courts examine the totality of the circumstances. When the suspect is a juvenile, the totality of the circumstances includes the juvenile's age, experience, education, background, and intelligence as well as his capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. A juvenile's access to advice from a parent, guardian or custodian also plays a role in assuring that the juvenile's waiver is knowing, intelligent, and voluntary.

(Internal quotations and citations omitted.) *Barker* at ¶ 24.

### Background

{¶16} D.T., who was 13 years old at the time, was interviewed by Detective Adam Garvin with the City of Elyria Police Department in December 2019 at the Nord Center. Detective Garvin was not in a police uniform during the interview. At the time of the interview, Detective Garvin was aware of D.T.'s age. D.T. was interviewed in a small room which contained a couch, a coffee table, a couple of chairs, and some shelving. Only D.T. and Detective Garvin were in the room during the interview. Detective Garvin did not know who brought D.T. to the interview but testified that whoever did would have been in a room just down the hall. The interview lasted a little over an hour and a half.

{¶17} Initially, D.T. was seated on the couch and Detective Garvin was seated in a chair across from D.T. The door to the room remained closed for the vast majority of the interview. Detective Garvin testified that D.T. was free to leave and Detective Garvin believed that he told D.T. that D.T. was not under arrest, although the recording of the interview does not reflect that Detective Garvin informed D.T. of either. The interview began with Detective Garvin telling D.T. that Detective Garvin was a police officer and that the biggest thing that police officers do is to try to help people. Detective Garvin then told D.T. that Detective Garvin had to tell D.T. about his *Miranda* rights. Detective Garvin testified that he told D.T. his *Miranda* rights because the door was closed and because "it was possible that he could have thought he was not free to leave."

{¶18} Detective Garvin asked D.T. if he had spoken to a different detective the previous week. D.T. responded in the affirmative and stated that detective's name. Detective Garvin asked if she told D.T. "these things," referring to his *Miranda* rights, and D.T. responded "yeah." At the hearing, Detective Garvin indicated that D.T. had previously spoken with a Lorain County Sheriff's detective, whom Detective Garvin believed also advised D.T. of his *Miranda* rights.

{¶19} Detective Garvin then listed the *Miranda* rights. At the end, Detective Garvin told D.T. that if at any point D.T. wanted to stop talking to Detective Garvin that D.T. could stop talking to him. Detective Garvin then asked if that was okay and D.T. responded, "uh huh." Detective Garvin interpreted that as D.T. understood and agreed to talk. It was Detective Garvin's professional opinion that D.T. understood his *Miranda* rights.

{¶20} Detective Garvin then spent the first part of the interview asking D.T. preliminary questions, conducting a developmental assessment, and making sure that D.T. understood the importance of telling the truth. Detective Garvin next asked D.T. if he knew why he was there. D.T. indicated that he did not know what he was there to talk about.

**{¶21}** Once Detective Garvin started focusing his questions on the incident, D.T. became very quiet and reserved; however, he did not appear confused to Detective Garvin. Detective Garvin acknowledged that D.T. "didn't really want to talk about it[.]" According to Detective Garvin, because of this shift in behavior, Detective Garvin took a break, and, when he came back into the room, he sat in a chair that was next to the couch, right next to D.T. Detective Garvin indicated that he did this to build trust; however, the video also demonstrates that by sitting where he moved to, Detective Garvin was also largely blocking access to the closed door.

**{¶22}** Detective Garvin testified that, later in the interview, D.T. did say something along the lines of he wanted to leave or wanted to be done. The video confirms that D.T. stated that he wanted to go and that he did not want to be there. Detective Garvin averred that he did not prevent D.T. from leaving but also did not tell him that he could leave. Detective Garvin also continued to question D.T. In so doing, Detective Garvin repeatedly told D.T. that he was not there to get D.T. in trouble and that he was there to help D.T. The video also evidences that Detective Garvin told D.T. that he could not help D.T. if he did not tell Detective Garvin what happened, that D.T. would feel better after he told what happened, that D.T.'s sister already told what happened, and that Detective Garvin knew that D.T. did not want to talk but that D.T. had to.

**{¶23}** Detective Garvin left the room a second time, around an hour and six minutes into the interview. When he returned, D.T. asked if he could use the bathroom. Detective Garvin asked D.T. if he could wait five minutes and D.T. indicated he could. Over ten minutes later, D.T. again asked to use the restroom and Detective Garvin finally took him.

**{¶24}** During the latter portion of the interview Detective Garvin told D.T. that he could go to jail for a long time. Detective Garvin also told D.T. that it was Detective Garvin's job to create a report to send to the prosecutor's office and the prosecutor's office would take that to court

and make sure that D.T. got sentenced to a couple years in jail. Detective Garvin then told D.T. that he did not want that to happen, he wanted to help D.T., but D.T. needed to help himself. If D.T. did not help himself then that would happen.

{¶25} Throughout the interview, Detective Garvin did not raise his voice or yell at D.T. At no point did D.T. ask to speak to a parent or an attorney.

{¶26} Ultimately, D.T. did make disclosures during the interview, indicating that he pulled down his pants and touched his private area to his sister's buttocks. D.T. also created a drawing concerning the incident.

{¶27} Overall, when D.T. was not asked to talk about the incident, he was fairly talkative. However, once the discussion turned toward the incident, D.T. was quiet, reserved, and not very forthcoming. At the end of the interview, D.T. was not arrested.

## Custody

{¶28} Having reviewed the totality of the circumstances, we conclude that the trial court erred in determining that D.T. was not in custody as we cannot say that a reasonable 13-year-old in D.T.'s position would have felt free to terminate the interrogation and leave. *See In re A.A.*, 2009-Ohio-4094, at ¶ 7. D.T., who was 13 years old at the time, was interviewed by a police officer in a small room with the door closed almost the entire time for a period of an hour and a half. There was no parent or guardian in the room with D.T. For part of the interview, Detective Garvin sat very close to D.T. and in a position that obstructed a pathway to the door. D.T. was not told he was not under arrest nor was he told he was free to leave, even after he stated that he did not want to be there, and he wanted to leave. D.T. also indicated that he did not want to talk about the incident, yet Detective Garvin told D.T. that he had to and that he would feel better after he did. Detective Garvin also informed D.T. that talking about it was how D.T. would help himself.

{¶29} D.T. was told he could go to jail for a couple of years for his conduct, even though nothing in the record suggests that D.T. could be sent to an adult jail. D.T. was not allowed to immediately go to the bathroom when he asked to do so. Even Detective Garvin testified that he informed D.T. of his *Miranda* rights because "it was possible that he could have thought he was not free to leave."

{¶30} The totality of the circumstances support that a reasonable 13-year-old in D.T.'s position would not have felt free to leave.

### *Miranda* Waiver

{¶31} Additionally, considering the totality of the circumstances, we conclude that the trial court erred in determining that D.T. knowingly, voluntarily, and intelligently waived his *Miranda* rights. *See Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, at ¶ 24.

{¶32} D.T. was read his *Miranda* rights. Yet he was never asked if he understood them or if he wanted to continue talking with Detective Garvin. Instead, after the rights were read, D.T. was informed he could stop talking to Detective Garvin at any point and D.T. was asked if that was okay. D.T. appeared to respond in the affirmative. However, this Court cannot say that that response equated with D.T. understanding he was entitled to counsel, knowingly and intelligently declining to have counsel present, and agreeing to continue speaking with Detective Garvin. In fact, it is difficult for this Court to even say that an adult would have understood that he or she was being asked to waive his or her *Miranda* rights based upon the language used by Detective Garvin.

{¶33} While it is true that D.T. had been recently interviewed by law enforcement prior to the interview at issue, and that D.T. had been advised of his *Miranda* rights to some degree at that time, there is nothing in the record that provides more detail about that encounter. Nor does

that prior encounter in and of itself absolve law enforcement of its duties under *Miranda* with respect to the interrogation at issue.

**{¶34}** Additionally, we are mindful that D.T. did not have a parent or guardian present with him at the time he was read his *Miranda* rights. *See id.* at ¶ 24. There was also evidence in the record that months after the interview, D.T. was found by the trial court to be incompetent to stand trial.

**{¶35}** Overall, the record before this Court does not evidence that D.T. knowingly, voluntarily, and intelligently waived his *Miranda* rights.

**{¶36}** D.T.'s second assignment of error is sustained.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN FAILING TO SUPPRESS D.T.'S STATEMENTS TO THE POLICE BECAUSE THEY WERE INVOLUNTARY AND OBTAINED IN VIOLATION OF THE RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.

**{¶37}** D.T. argues in his first assignment of error that his due process rights were violated as his statements to police were not voluntary. Given this Court's resolution of D.T.'s second assignment of error, this argument has been rendered moot, and we decline to address it.

**{¶38}** D.T.'s first assignment of error will not be further addressed.

### III.

**{¶39}** D.T.'s second assignment of error is sustained, and his first assignment of error is moot. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is reversed, and the matter is remanded for proceedings consistent with this decision.

Judgment reversed,<br>
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

DONNA J. CARR
FOR THE COURT

STEVENSON, J.
FLAGG LANZINGER, J.
CONCUR.

APPEARANCES:

VICTORIA FERRY, Attorney at Law, for Appellant.

J.D. TOMLINSON, Prosecuting Attorney, and MARK KOZA, Assistant Prosecuting Attorney, for Appellee.